UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

VERONICA GONZALEZ, et al.,
    Plaintiffs

v.                       CASE # 4:14-cv-00049-JMH-HBB

CITY OF OWENSBORO, et al.,
    Defendants

VIDEOTAPED DEPOSITION OF JEFF TONG

DECEMBER 18, 2014

The videotaped deposition of JEFF TONG was taken pursuant to Notice on the 18th day of December 2014, beginning at 1:12 p.m., at the law offices of Caslin & Cecil, 3201 Alvey Park Drive West, Owensboro, Kentucky; said deposition was taken for any and all purposes permitted by law.

2

APPEARANCES:    Hon. M. Michele Cecil
                CASLIN & CECIL
                3201 Alvey Park Drive West
                Owensboro, Kentucky   42303

                Hon. Matthew J. Schad
                SCHAD & SCHAD, P.C.
                223 E. Spring Street
                New Albany, Indiana   47150
                ATTORNEYS FOR PLAINTIFFS


                Hon. W. Greg Harvey
                KERRICK BACHERT STIVERS PSC
                1025 State Street
                PO Box 9547
                Bowling Green, Kentucky   42102


                Hon. Kerry D. Smith
                McMURRY & LIVINGSTON, PLLC
                201 Broadway
                PO Box 1700
                Paducah, Kentucky   42002-1700


                Hon. Christopher M. Mayer
                PHILLIPS, PARKER, ORBERSON & ARNETT, PLC
                716 W. Main Street, Suite 300
                Louisville, Kentucky   40202

TELEPHONIC
APPEARANCE:     Hon. Carl D. Edwards, Jr.
                VanANTWERP, MONGE, JONES, EDWARDS & McCANN
                1544 Winchester Avenue, Fifth Floor
                PO Box 1111
                Ashland, Kentucky   41105-1111


ALSO PRESENT:  Kevin Culligan
               Joe Schepers

VIDEOTAPED DEPOSITION OF JEFF TONG

DECEMBER 18, 2014

I N D E X

CAPTION, APPEARANCES & INDEX: -------------------- 1-3

VIDEOTAPED TESTIMONY OF MR. TONG: --------------- 4-113
  Direct Examination by Mr. Schad: -------------- 4-80
  Cross Examiantion by Mr. Mayer: --------------- 80-93
  Cross Examination by Mr. Smith: --------------- 93-105
  Redirect Examination by Mr. Schad: ------------ 105-111
  Recross Examination by Mr. Mayer: ------------- 111-113

CERTIFICATE BY REPORTER: ------------------------ 114

EXHIBITS: --------------------------------------- Attached

4

THE WITNESS, BEING FIRST DULY SWORN UPON HIS OATH, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION BY HON. MATTHEW J. SCHAD, ATTORNEY FOR PLAINTIFFS:

Q     How are you?

A     Fine.

Q     Can you state your name for the record, please?

A     Jeff Tong.

Q     Mr. Tong, my name is Matt Schad.  We met a few minutes ago.  You ever given a deposition before?

A     No.

Q     Okay.  I'm sure you've had a chance to talk with your attorneys, but let me give you sort of the overview and the fly by so that we all are operating off the same set of rules.  Sound good?

A     Uh-huh.

Q     Okay.  First rule is that, although we're videotaping this, you have to give audible answers, spoken word answers, so that the court reporter can type down what you say.  You understand that?

A     Yes.

Q     Okay.  Almost everybody forgets that at some point during the day and they say, "uh-huh" or "huh-uh," and if you do that, I'll ask you to repeat it or

to say it out loud.  Okay?

A    Yes.

Q    I'm not picking on you.  That just happens most of the time.  So you understand that?

A    I understand.

Q    If I ask you anything that you don't understand, will you tell me?

A    Yes.

Q    And if there's a question I ask that you don't understand or the phrasing of it's hard to understand, I'll either change it or repeat it back if you ask me to do that.  Sound good?

A    Yes.

Q    If you answer a question, I'm going to assume that you understood it.  Is that fair?

A    Yes.

Q    All right.  If you need to take any breaks for any reason - - I usually break about once an hour anyway, for five minutes, just to stretch or use the bathroom or something.  So if you have anything else going on that you have to take a break for, as long as we get the question that's on the table off the table, that's fine with me.  Okay?

A    Okay.

Q    But you'll have to tell me -

A    All right.

Q    - that you want to do that.

Finally, a lot of times during depositions attorneys will object, and that's nothing unusual about that at all.  When that happens, will you listen to the question, wait for whoever is objecting to get that out, let us clear that up, and then, if you're instructed to, try to answer that original question as best you can? Sound good?

A    Yes.

Q    All right.

MR. SMITH:  May I ask a question on that point?

MR. SCHAD:  Sure.

MR. SMITH:  Are we waiving objections except as to form of the question, things like relevancy and things like that?

MR. SCHAD:  We sure can.

MR. SMITH:  Is that agreeable?

MR. HARVEY:  Yeah.  That's agreeable.

MR. SCHAD:  Great.

(Direct Examination continues by Mr. Schad:)

Q    All right.  Do you have any questions for me about how this works before we get started?

A    No.

Q    Okay.  Where are you from?

7

A    Owensboro, Kentucky.

Q    Whole life?

A    Yes.

Q    You grew up around here?

A    Yes.

Q    How old are you?

A    Fifty-six.

Q    Married?

A    Yes.

Q    What's your spouse's name?

A    Cynthia.

Q    Does she work for the City of Owensboro?

A    No.

Q    Do you have any other relatives who work for the City of Owensboro?

A    No.

Q    You go to high school here?

A    Yes.

Q    Did you graduate?

A    Yes.

Q    What year?

A    1977.

Q    Okay.  Any schooling after that?

A    Not to mention.

Q    College, technical training, maybe things

you went back for?

A    Technical training during high school.

Q    Okay.  What kind of technical training did you have?

A    Instrumentation.

Q    What kind of instruments?

A    Instrumental technician type training. Basic electricity, motor control, that sort of thing.

Q    Okay.  Where was that?

A    Out at the technical college, Daviess County.

Q    Any kind of degree or certificates or anything else like that in any technical specialities?

A    Certificates.

Q    Okay.

A    I didn't complete the course.

Q    Do you have certificates or degrees in anything that's engineering or structurally-related?

A    No.

Q    Do you have more training, like on-the-job training, in that sort of thing?

A    Yes.

Q    Do you have any continuing programs that you've gone to on a regular basis for engineering or structural training?

A    No.

Q    How about any continuing training in electricity or how electrical systems work?

A    No.

Q    Okay.  Tell me about your continued engineering, structural type training that you've had.

A    I haven't had any.

Q    None?

A    None.

Q    Has the City of Owensboro sent you to any sort of seminars or education classes or anything else like that where you get technical training on structural or electrical matters?

A    No.

Q    How long you been working for the City of Owensboro?

A    Twenty years.

Q    What's your jobs been for them?

A    Started out as a maintenance worker.  Went from maintenance worker title to building specialist, to now I'm a manager, divisional manager.

Q    Okay.  Let's just real briefly go through sort of the general time frames that you had those jobs. You started off in maintenance.  How long did you do that?

A    Probably five years before my new title.

Which in my new title I continued to do maintenance, but I moved into other areas as far as estimating and that sort of thing.

Q    What year did you start with the City?

A    November 7th, 1994.

Q    How did you get that job?

A    Interviewed for it.  Applied for it, interviewed.

Q    Since you've been working for the City, have you been in the same division?

A    Yes.

Q    Okay.  What's the name of that division?

A    Facilities maintenance.

Q    Okay.  Who's the head of that division?

A    We have a director, Wayne Shelton, and we have a technical director of operations, is Lelan Hancock.

Q    Have you always been in that division since you've been working at the City?

A    Yes.

Q    Okay.  So for about five years you worked in maintenance.  What did you do in maintenance?

A    Special to our branch is maintaining City facilities.

Q    Buildings?

A    Yes.

Q     Equipment and buildings?

A     No.  We had electricity technicians that took care of all the mechanical equipment.  Basically I was, you know, painting, anything like that as far as just general maintenance.

Q     Would it be fair to say handyman type stuff?

A     Basically.

Q     Okay.  You didn't do HVAC work?

A     No.

Q     Did you do any electrical work?

A     No.

Q     Didn't do any wiring?

A     No.

Q     Okay.

A     Also had a licensed electrician.

Q     You are?

A     No.  Our division did.

Q     Who is that?

A     Greg Kelley.

Q     Rick Kelley?

A     Greg.

Q     Greg Kelley.  And is he still there?

A     Yes.

Q     All right.  So after your five-year stint

12

in maintenance, what did you tell me that you moved to?

A    Building specialist.

Q    What's a building specialist do?

A    Well, basically it's a different title, a different pay scale.  And all the division started doing more of the estimating for different projects, that sort of thing.

Q    When you say estimating, can you kind of explain to people watching the tape what you mean by that?

A    Well, I mean, if like the building needed a roof on it, before contracting, you know, they want to know, for budget purposes, they may want to know what the cost might be for that project.

Q    Who's your boss in that job?

A    Currently?

Q    No.  I'm sorry.  When you were the building - -

A    Tommy Cecil.

Q    Okay.  And how long did you do that second job you had, the building job?

A    I'm thinking it was probably six years.

Q    So, by my math, for the last nine or ten years you've been doing the job that you have right now?

A    Yes.

Q    Okay.  And what's the formal title for the

job that you're doing right now?

A    Facilities maintenance manager.

Q    Do you supervise people?

A    Yes.

Q    What kind of employees do you supervise?

A    HVAC technician, electrician.  We have a building specialist, two buildings specialists.  One of those positions is open right now.  Then I have an operations supervisor.

Q    Those are all direct reports to you?

A    Yes.

Q    Okay.  What is your division responsible for?

A    Maintaining city facilities.

Q    What kind of facilities?  Buildings?

A    Buildings.

Q    Okay.  Other than buildings, what else does your branch maintain?

A    Swimming pools, walking trails, fencing.  That's about it.

Q    Parks?

A    Yes.  Any of those amenities there in the parks.

Q    Okay.  Bridges?

A    Walk bridges.

14

Q    Walk bridges?

A    Golf course, some of the walk bridges.

Q    Roads?

A    No.

Q    Don't do any road maintenance or anything like that?

A    No.

Q    Are there various electrical issues that come up with those facilities that you have to maintain?

A    Yes, somewhat.

Q    Is that why you have an electrician on staff?

A    Yes.

Q    And is that why they're a licensed electrician?

A    Well, you have to be licensed to do maintenance.  You have to be licensed to install new services.

Q    What kind of work does Greg Kelley do for facilities maintenance?

A    Electrical maintenance.

Q    Any other electricians on staff?

A    No.

Q    Any other electricians on staff city-wide, not just in your division?

A    No.

Q    Okay.  You told me about who it is, who are direct reports to you.  What's the chain of command look like from you, on up?

A    I report to the deputy director of operations.  He reports to the director of public works.

Q    Who's that?

A    Wayne Shelton.

Q    Okay.

A    And he reports to the assistant city manager.

Q    Who's that?

A    Ed Ray.

Q    Mr. Schepers is here today.  How does he fit into your chain of command, or does he?

A    He's engineering; deputy director of engineering.

Q    Do your two jobs overlap with each other?

A    Not normally.

Q    Okay.  So you're not in each other's chain of command, so to speak?

A    No.

Q    Okay.  Are you on the depth chart sort of at equal spots?

A    No.

Q     Okay.  Tell me about what's different from his job about your job.

A     He's paid more.

Q     Okay.  Anything other than pay?

A     Well, he holds degrees, and I have a high school education.

Q     Okay.  What's he responsible for in the City that you're not responsible for?

A     You would have to ask Joe that.

Q     You're not sure?

A     No.

Q     Does your job sometimes bring you into contact with Joe?  You have to work together on projects?

A     Very seldom.

Q     Okay.  Does it happen sometimes?

A     Occasionally.

Q     Okay.  On those occasional times when you and Mr. Schepers have to work together, what kinds of issues are - - what are the issues that bring you together like that?

A     He has light out in his office, or a drinking fountain in his area is not working, that sort of thing.

Q     Okay.  It sounds like you don't work together on planning or implementing projects; you just

run into him when you're doing building or facilities maintenance?

A    That's correct.

Q    Okay.  Do you have a budget that you manage?

A    Yes.

Q    And are you responsible for that budget?

A    Yes.

Q    Can you tell me what your budget is in a year?

A    The amount?

Q    Yes.

A    It varies year to year; 900 to 1.2 million.

Q    Is that all for maintenance?

A    Yes.

Q    Okay.  Are you in charge of new construction projects at all?

A    Yes.  I will oversee them.

Q    Okay.

A    Usually funds are allocated and I'm usually, once I get it, I'm just overseeing the project.

Q    You're supervising it?

A    Right.

Q    So if there's some new park that's being built or some new facility, part of your responsibilities

18

are to monitor that?

A    Yes.   Parts of it.

Q    Okay.   Do you handle any of the bidding process for things like that?

A    No.   For projects that size you're talking about, no.

Q    Okay.   Now, within your budget are you also responsible for determining salaries and such of people who work beneath you?

A    No.

Q    Who do you work with on budgeting issues?

A    Deputy director, public works.   Lelan Hancock.

Q    When it comes to budgeting stuff, is that the next higher level up from you?

A    Yes.   It's all approved, higher level.

Q    Where's your office?

A    Fifth Street.   1410 West Fifth.

Q    Do you keep office hours or are you out and about most of the time?

A    Both.   Probably 50/50.

Q    Do you have an assistant or somebody who helps you out?

A    Yes.

Q    Who is that?

19

A    Joe Welsh.

Q    Okay.  And Joe, is that a him or a her?

A    It's a him.

Q    Okay.  Didn't know if it was J-o-e or J-o.

How long has Joe Welsh been your assistant?

A    I think probably two years now.

Q    Okay.  What's he help you out with?

A    Well, run projects, running maintenance projects.  Does a lot of hands-on himself.

Q    Now, as part of your job do you have to use a computer?

A    Yes.

Q    And do you use e-mail to communicate with the other people in the City or contractors?

A    Yes.

Q    Is that an e-mail address that has City of Owensboro or some official domain name behind it?

A    Uh-huh.

Q    Is that a "yes"?

A    Yes.  Sorry.

Q    That's okay.  I told you that would happen.

What is your e-mail address?

A    It's TongJL@Owensboro.org.

Q    And do you have through that system access to e-mails that you've sent to other people?

A    Yes.

Q    And do you have access to e-mails that other people have sent to you?

A    Yes.

Q    Do you have any sort of policy within your office for what e-mails you keep and what e-mails you might delete or get rid of?

A    Yes.

Q    What is that policy?

A    Well, I mean, it's relatively new training we've been getting on retaining - - retainage of e-mails and things.  My policy is I keep what I think is important in my operation and delete what I don't.

Q    Okay.  Do you have someone who is in the IT department who assists you with keeping your computer system and your e-mail system running?

A    Yes.  We have an IT department.

Q    Okay.  Who's the head of your IT department?

A    Angela Hamric.

Q    Can you spell that last name for me?

A    It's H-a-m - - I don't know how she spells it.

Joe, do you know how Angela spells that?

Q    Angela Hemric?

21

A    Hamric.

MR. HARVEY:  If you don't know, you don't know.

We can find out for you, if you'd like, Matt.

Q    As part of coming to this deposition today have you looked at anything, looked at any documents?

A    No.

Q    Okay.  Have you reviewed any e-mail, either on your computer or printed?

A    No.

Q    Have you talked with any other City employees, not counting any attorneys, about anything involving the death of Mr. Gonzalez or the bridge or whether it was energized or not?

A    No.

Q    Have you ever talked with anybody else, other than an attorney, about this incident?

A    No.

Q    So, as you sit here today, you've never had any conversation with anyone about Mr. Gonzalez's death?

A    No, other than with our attorneys, and what was already publicized.

Q    What do you mean, "what was already publicized"?

A    What was in the paper.  I read the paper, Messenger-Inquirer.

22

Q    Okay.  So let me make sure I understand that.  Did you talk to the paper, or are you just talking about things that you read in the paper?

A    Yeah.  Discussion would come up, as far as the article, regarding the case.  Yeah, it was in the paper.

Q    Okay.  And are you talking about talk - - let me make sure I understand more specifically.  Did you talk with journalists who wrote the article, or were you just talking with co-workers or other people about something that was in the paper?

A    Yeah.  Subjects would come up with anyone in general, yeah.

Q    Okay.  In your official capacity has any other City employee ever asked you any questions about the electrical system on the Owensboro bridge?

A    No.

Q    Have you been involved in any way in de-energizing the Owensboro bridge at any point?

A    Personally, no.

Q    Okay.  What do you mean, "personally"?

A    Well, actually physically go down and do it.  If it has to be done, I don't do it, no.

Q    Do you help other people do that or communicate or facilitate that in some way?

A    If we're having work done on it, yeah, I communicate that to the contractor.

Q    Do you do that through e-mail?

A    No.

Q    Do you do that through a phone call?

A    Well, yeah, because I'm contracting someone to do the work.  Naturally, we've talked about it on the phone.

Q    What contractors have you talked with over the phone or by any other way about de-energizing the electricity on the Owensboro bridge?

A    Typically would be any time that I got a contractor down there to work on it.  The subject of, you know, de-energizing it would come up.

Q    Can you name the contractors who you've worked with in that way for me?

A    Dynalectric and Beltline, which was originally Dynalectric.

Q    Okay.  Other than those two companies that you've mentioned, have you ever worked with any other contractors on issues regarding de-energization of the Owensboro bridge?

A    No.

Q    Okay.  Have you worked with any other contractors at all, that you can ever remember, on any

issues pertaining to the Owensboro bridge?

A    After the accident, yeah, I had a couple of other contractors there.  My electrician was out of town so I had to have some assistance.

Q    Okay.  I'll get to what happened after a little bit later.  Let's stick now with the time period from when you started with the City, up until the point Mr. Gonzalez got electrocuted.  Okay?  During that time, if I understand what you're telling me, there were only two contractors who you ever dealt with concerning any work on the bridge, and they're Beltline and I think you said Dial [sic], right?

A    Dynalectric, yes.

Q    Okay.  Have you ever had to deal with other government agencies before Mr. Gonzalez's death about issues surrounding the bridge?

A    No.

Q    Okay.  You've never worked with or dealt with the Kentucky Transportation Cabinet or anyone in it?

A    No.

Q    You have not sent them e-mails?

A    No.

Q    Okay.  They have not sent you e-mails?

A    No.

Q    Okay.  How about anyone from OSHA, Kentucky

OSHA, or any other safety regulatory agency?

A    No.

Q    Okay.  I've got some exhibits to show you. These are numbered.  The first couple questions pertain to just some general information about the bridge.  Are you familiar with the bridge?

A    Yes.

Q    Okay.  You've been on it?

A    No.

Q    No?  You've never been on it?

A    No.  Never.

Q    Never driven across it?

A    Yeah, I've driven across it.

Q    Oh, okay.  That's what I meant by be on it.

A    Well, that's a trick question.  Yeah, I've been on it.  I've driven across it.

Q    Okay.  But you've never walked on it, never worked on it before?

A    No.  No.

Q    Okay.  Is there a nickname that you use for it, or do you just call it the Owensboro bridge?

A    Owensboro bridge.

Q    Does any part of your job require you to deal with issues involving the bridge?

A    Yes.

26

Q     And what parts of your job require you to deal with the bridge?

A     The decorative lighting on top of the bridge.

Q     Okay.  Tell me more about what your job responsibilities are as they pertain to the decorative lighting on the Owensboro bridge.

A     Make sure the lights are burning.

Q     Is that part of your job responsibility?

A     Yes.

Q     Okay.  So your division has control or responsibility over the decorative lighting system for the Owensboro bridge?

A     Yes.  Make sure the lights are burning, yes.

Q     Okay.  And does that responsibility include other safety issues regarding those decorative lights?

A     No.

Q     Okay.  So your job responsibilities require you to keep the decorative lights on or working, correct?

A     (WITNESS NODS YES INDICATING THE AFFIRMATIVE.)

Q     Is that right?

A     Uh-huh.

Q     Yes?

A    Yes.

Q    Okay.  But they do not require you to handle or deal with any safety issues regarding the decorative lighting?

A    Not directly, no.

Q    Okay.  Who in the City of Owensboro is responsible for the safety issues involving the decorative lighting of the Owensboro bridge?

A    Don't know.

Q    Okay.  Do you know who would know?

A    No.

Q    Is there anyone who works for the City of Owensboro who's in charge of overall safety for the City?

A    Yes.

Q    Who is that?

A    Our safety director.

Q    Who is the safety director?

A    Leslie Smithers.

Q    Okay.  And tell me about her job responsibilities.  What does she do to help keep people, employees, or the public safe in the City of Owensboro?

A    I don't know.

Q    Okay.  So is it your belief that she would be the one in charge of or responsible for safety of the decorative lighting system on the bridge for the City?

28

A    I don't know.

Q    Okay.  So after 20 years as a facilities -- in the facilities department and working for the City, as you sit here today, you don't know what the chain of responsibility or command is for safety on the Owensboro bridge?

A    No.

Q    And no one from the City has ever told you or explained to you who is responsible for safety on the decorative lighting system of the bridge?

A    No, because our staff is never up there.

Q    Okay.  Are there any divisions or agencies for the City who would have staff or personnel on the bridge?

A    No.

Q    Okay.  Now, as part of any of the events that occurred with the bridge after Mr. Gonzalez was electrocuted, have you been on the bridge on foot or in the spans of the bridge or inspected it in any way?

A    Yes.  We were there the day the coroner requested assistance.  I was there that day.

Q    Now, I've provided you with some photographs.  These are Google Earth photographs.  They're marked 1 through 3.  Do all of these pictures show the Owensboro bridge?  Take a look at them.

A    You're asking me to look at them?

Q    Yes.

A    (WITNESS REVIEWS PHOTOGRAPHS.)

Q    And let me apologize for a second.  I only need for you to look at the first three pictures.  I'm sorry.  I didn't intend for you to have to look through the whole - -

A    I was going to say, that could be any bridge.

Q    Okay.

A    Yes, I think so.

Q    Okay.  So those pictures, 1 through 3, are aerial or satellite views of the bridge, right?

A    Yes.

Q    Okay.  And these are Google Earth pictures.  You know what a Google Earth photo is, don't you?

A    Uh-huh.

Q    Yes?

A    Yes.

Q    Okay.  Do you use Google Earth as part of your job at all?

A    No.

Q    Okay.  Is your office location visible on this picture Number 1?

A    No.

30

Q    All right.  How far away from the bridge is your office?

A    Probably six or seven city blocks, probably.

Q    Okay.  You ever reviewed documents pertaining to the bridge such as blueprints, diagrams, schematics, or other engineering type documents?

A    No.

Q    As part of any preparation, in either the investigation of Mr. Gonzalez's death, or for your deposition today, have you looked at any photographs of the bridge?

A    No.

Q    Okay.  Have you ever seen any photographs taken of the bridge as part of investigations into Mr. Gonzalez's death?

A    No.

Q    Have you ever reviewed or looked at any reports of any investigation of the events surrounding Mr. Gonzalez's death?

A    No.

Q    Have you ever written any portion of a report or given a written statement about the events surrounding Mr. Gonzalez's death?

A    Post-incident, my report.

Q    Okay.  You made a report post-incident?

A    Yes.  The day after.

Q    Okay.  And who asked you to do that?

A    No one asked me to.

Q    Did you just do it on your own?

A    Yes.

Q    Okay.

A    For my own information.

Q    All right.

A    If I were questioned later.

Q    Okay.  And that wasn't because you were - - that wasn't part of any policy to do that, right?

A    No.

Q    Okay.  And these thoughts that you put into the report, was it written by hand or e-mail or typed up?  How did you do it?

A    It was typed up.

Q    Okay.  Did you type it up?

A    Yes.

Q    Was it on City letterhead?

A    No.

Q    Was it just - - did it have any kind of letterhead on it?

A    No.

Q    And what did you put in the report?

32

A    The facts, times.

Q    What kind of facts did you put in the report?

A    Facts of chronologically how things happened that day, day after.

Q    Where did you get those facts from?

A    They were my facts.  They were what I did.

Q    Let me be more specific.  Did you ask other people questions or interview other people to put stuff in that report?

A    No.

Q    Okay.  Did you go to the scene or go to any physical location to look at things to put into that report?

A    No.

Q    Did you look at any old e-mails, letters, phone messages, or any other type of written piece of paper or computer document to get the information to put in that report?

A    No.

Q    Did you just want to make sure that the facts were straight in your mind?

A    Yes.

Q    Okay.  And you weren't asked to do that by any attorney?

33

A    No.

Q    And you weren't asked to do that by any insurance company?

A    No.

Q    What did you do with that report?

A    Filed it.

Q    Who did you file it with?

A    Filed it in one of my files in my City drive.

Q    Okay.  Have you given it to anybody?

A    Yes.  Given it to you guys.

Q    Okay.  I saw a Post Incident - -

A    Well, actually I give it to our attorney.

Q    Okay.  And does that have the title Post Incident Report on it?

A    Yes.

Q    Okay.  I want to take you back to when the bridge painting project for the Owensboro bridge was just underway.  Do you remember that?

A    Kind of.

Q    Was it in 2013?

A    Yes, I think so.

Q    Okay.

A    I had no involvement with the painting of the bridge.  Not clear on the dates.

34

Q    None of your job responsibilities required you to have to deal with people on the painting of the bridge; is that right?

A    No.

Q    What City employees would've had jobs that would've required them to participate somehow in the coordination of that bridge painting?

A    I don't know.

Q    Do you know why it was or - - strike that.

Do you know if it was important to the City that the bridge be painted?

A    I don't know.

Q    But you don't know who deals with - - who would deal with the bridge painting on behalf of the City?

A    No.

Q    Did you generally know that the bridge was going to be painted that summer?

A    Information, yeah, from local media.

Q    Just reading it, seeing it on TV?

A    Yes.

Q    Something like that?  Okay.

Is there a road over the bridge?  Is it a highway?

A    I'm assuming.

Q    Okay.  What road or highway is it?

A    I call it 231.  I'm sure it has another number.

Q    Do you know if the City of Owensboro has any responsibility for maintaining that road?

A    No.

Q    That's a bad question on my part.  I'm sorry.  Do they, or are you unsure?

A    I don't know.

Q    Okay.  Do you know if the City of Owensboro has any responsibility for any part of that bridge, other than the decorative lighting system?

A    I don't know.

Q    Okay.  Do you know what person, agency, division of government is responsible for the structural maintenance or integrity of the bridge?

A    I don't know.

Q    Okay.  But as it pertains to the decorative lighting system, you're aware that that's something that the City handled?

A    Yes.

Q    Okay.  As part of your job would you ever have to coordinate permits of any kind for people entering the bridge or going up and down the bridge?

A    No.

Q    Did you ever have to speak with anyone from

any other government agency or the state about permits or safety procedures for going up and down the bridge?

A    No.

Q    Who would do that for the City; do you know?

A    The contractor that I contracted to make repairs, I assume would be their responsibility.

Q    Okay.  And that was Beltline, I believe you said, right?

A    Beltline.

Q    Okay.  Did you have any sort of standing agreement with - - let me strike that.

Do you use Beltline for other stuff too?

A    I don't think so.

Q    Okay.  Do you have to contract with other electrical companies to help maintain the facilities?

A    Yes, occasionally.

Q    Okay.  You can't do it all with the electrician that you have on staff?

A    That's right.

Q    What other companies do you use?

A    We use May Electric, Norman King Electric. I think that's it.

Q    Okay.  Why use Beltline?  Did you even choose Beltline for any work that was done with regard to

37

the decorative lighting system?

A    We would contact three vendors.  Was a bid process which is handled through purchasing.

Q    Did you handle that?

A    Not the actual award of the contract, but as far as getting the three quotes, yes.

Q    Okay.  And had you ever done that with Beltline for work to be performed on the bridge or inspections on the bridge before Mr. Gonzalez was electrocuted?

A    Yes.

Q    Okay.  And what did you ask Beltline to do?

A    Asked them to troubleshoot, replace burnt-out lamps, and repair any deficiencies they can find.

Q    Did you ask them to inspect it?

A    Yes.  I said that.

Q    Okay.  So you'd be the person for the City who'd have the responsibility to ask electricians or contractors to check out the electrical lighting system on the bridge?

A    Yes.

Q    Okay.  Was there anyone else for the City who would've had the responsibility of monitoring the decorative lighting system on the bridge?

A    No.

Q    That would have all been on you?

A    Yes.

Q    And do you know how long the decorative lighting system has been on that bridge?

A    Well, I wasn't around when it was originally. I don't know. '93, 4.

Q    Okay. Had you already - - was it there before you started working for the City?

A    I think it was in the process. I think funds had been allocated.

Q    Now, in the 10 or 11 years that you've been in your current job, how many times have you ever asked any City employee or contractor to inspect the decorative lighting system on the bridge?

A    Well, would've been in my submittals. 2004, 2006, 2008, 2011, and 2013, inspections were completed.

Q    So those dates, '04, '06, '08, '11, and 2013 are all dates which you would have asked someone to inspect the decorative lighting system on the bridge?

A    Yes.

Q    Did you have the decorative lighting inspected at certain intervals, like particular intervals?

A    When we would notice, you know, several

lights out, we would have - - that's when we would have it done.

Q    Okay.  Have you always used Beltline for those?

A    Well, I would make three contacts.  I mean, they were electrician, local contractors, has the capability of working on that bridge.  Beltline seemed to always be the one that would get the contract.

Q    Let me ask in a different way.  I know you've always asked different - - you've bidded out.  Have different people won the bids?

A    No.

Q    Has it always been Beltline?

A    Yes.

Q    Okay.  So your testimony is that you asked Beltline and they performed work and inspections separately in 2004, 2006, 2008, 2011, and 2013?

A    Didn't in '13.

Q    Okay.  But those other four years that you mentioned, you specifically asked Beltline to perform inspections and maintenance?

A    Well, yeah.

Q    Okay.  Now, is part of your job as facilities manager to protect City employees and citizens from possible dangers of the structures that you manage?

A    Is it my direct responsibility?

Q    Is it one of your responsibilities?

A    I would think it would be any City employee's responsibility.

Q    You perform maintenance to keep those structures safe?

A    Well, I perform maintenance on them, yes, our structures.

Q    Okay.  And one of the reasons is to keep people safe?

A    Well, I mean, that's part of it.  I mean, yeah, I guess so.

Q    Okay.  Do you know of anyone else within the City of Owensboro government who has direct responsibility for the safety of the facilities of the City?

A    I'm not sure I understand.  Ask.

Q    Sure.  And let me back up and ask it in a different way.

As part of your job, you maintain City facilities, and one of the reasons you do that is to keep people safe, correct?

A    That's a by-product, yeah, of what I do.

Q    And part of the purpose is to keep City employees safe, right?

41

A     Yes.

Q     Okay.  And part of the reason you do that maintenance is to keep the public safe, correct?

A     Not solely, but, yes, sometimes that is a by-product.

Q     That's a part of the job?

A     That's right.

Q     And part of the safety aspect of that is to keep people who work on those areas safe, correct?

A     Well, yes.

Q     Like when you have contractors who come and do work on your facility, there's certain safety protocols, I'm assuming, that the City requires, that you require, right?

A     I mean, every situation is different, but, yeah, safety, yeah, is a priority any time.

Q     Proper PPE is a priority, right?

A     Yes.

Q     And have you had training in safety from people who come in and lecture about it, that the City brings in or anything?

A     Occasionally, over the years, maybe.

Q     Is there any sort of safety training program that the City has?

A     What area?

Q    I don't know.  Like general OSHA hazard communications, safety?

A    We complete all of our annual OSHA training as far as PPE, hazcomm, that sort of thing.

Q    And the City has one licensed electrician on staff to help keep the electrical systems of the City safe?

A    Keep them working, yes.

Q    And to keep them safe, too?

A    I've said safety is always a priority.

Q    Okay.  But there's specifically an electrician to help ensure electrical safety on the City's facilities, correct?

A    Yeah, that's part of the job.

Q    Okay.  That's one of the reasons you have a licensed electrician?

A    To keep things working, but safety is a part of that, yes.

Q    And is it your understanding that an electrician has to be licensed because it wouldn't be safe to have someone who isn't licensed doing that kind of work?

A    Yes.

Q    All right.  And during the time that you've been facilities manager and you've dealt with the

43

electricity on the decorative lighting project, you've had a licensed electrician available to you to ask questions, correct?

A    Well, we've never directly worked on the lighting, so, I mean, we always had it contracted.

Q    Okay.  But regardless of who did the work on the lights, you had access to a licensed electrician to ask questions about or to perform inspections if you had asked him to do that, correct?

A    If I had asked him to do it, yes, but I didn't.

Q    Did you ever ask any licensed electrician who works for the City to perform any work on the decorative lighting system?

A    No.

Q    Did you ever ask any licensed electrician who works for the City to inspect any aspect of the decorative lighting system?

A    You have to be more specific.  You talking about what's on top of the bridge or the equipment that's down on the ground?

Q    That's a good point.  Let's talk a little bit about what you consider the different parts of that system to be.  What do you consider to be the different parts of the electrical system for the decorative

44

lighting?

A    Anything that can't be reached off the ground –

Q    Okay.

A    – we do not do maintenance on.

Q    All right.  I know you haven't been up there, but are you generally familiar with the layout of the system?

A    From what I can see off the ground, yeah.

Q    Okay.  Take a look, if you can, at photograph 6.

Does this look like one of the decorative lights on the bridge?

A    Yes.

Q    Okay.  How about picture 7; is that one of the decorative lights on the bridge?

A    Yes.

Q    Okay.

A    I assume it is.

Q    Okay.  Are you familiar with the wires depicted in photographs 8, 9, or 10?

A    9 and 10, I can say that is.  Where it's at, I can't tell you.

Q    Okay.  Have you ever seen any of these pictures before?

A    8, 9, 10?

Q    Uh-huh.

A    No.

Q    Okay.  Have you ever seen pictures 6 or 7 before?

A    No.  No.

Q    Okay.  So for people reading this later and looking at these pictures, there's these lights that are on the top of the bridge, and 6 and 7 show what those lights look like, right?

A    You asked me if they look familiar, and they do look familiar.  I'm assuming it's the same bridge.

Q    And that's one part of the decorative lighting system that you mentioned.  What are the other parts of the decorative lighting system for the bridge?

A    Well, you have the control side, which the control panel is on the ground.

Q    Okay.  Using the diagram, either 1, 2, or 3, can you point, without marking just yet, where the control panel for the decorative lighting system would be?  And you can use whichever one of these pictures might let you show that the best.  You're free to use any one that you want.

A    How do you want me to show this?

Q    Just point.  Just point first.

46

A    Going to be right here.

Q    What did you call that?  The control panel?

A    Control panel, yes.

Q    Okay.  This pen might mark a little bit better.  Draw an arrow to that area that you mentioned, and mark it "control panel," if you could.

MR. HARVEY:  That's on Exhibit 2?

THE WITNESS:  Uh-huh.

Q    So how does the control panel affect the energy and the electricity that goes to the decorative lights?

A    Well, there's a timer in there that brings it on and off.

Q    Do you know how that works?

A    No.

Q    Okay.  Does it control the energy that goes to the decorative lighting system?

A    Yes.

Q    Does it control the power that goes to anything else?

A    No.

Q    Who supplies the power that the City uses to power the decorative lighting system?

A    OMU.

Q    And that's Owensboro Municipal Utilities?

47

A    Municipal Utilities, uh-huh.

Q    Do you have to deal with OMU as part of your job from time to time?

A    Yes.

Q    Is there any particular point of contact that you have over there?

A    Yeah.  I talk to their engineers.

Q    Okay.  Any engineers you know of by name for them?

A    Dale Harris.

Q    Okay.  Now, let's take a look at one of the pictures here, picture 11.  You ever seen that before?

A    Yes.

Q    What is that?

A    That's a lockout/tagout.

Q    And if you look at picture Number 12, is that the same thing, a little closer in?

A    Yes.

Q    And is that a lockout/tagout tag that you put in that position?

A    Uh-huh.

Q    Yes?

A    Yes.  Sorry.

Q    Where is that?

A    That was on the control panel.

48

Q    Okay.  So this lockout/tagout tag was placed in the control panel on the area where you marked Exhibit 2?

A    Yes.

Q    And that control panel has the timer and the energy source to the decorative lights?

A    Yes.

Q    And it doesn't control anything else?

A    No.

Q    Are there keys to that control panel?

A    Yes.

Q    It's locked, I assume?

A    Yes.

Q    With a padlock?

A    Yes.

Q    When it's not locked out and tagged out, is there some sort of built-in lock for it, or is it just with a padlock?

A    Padlock.

Q    Okay.  Who at the City - - or let me rephrase that.  Who at all would have had keys and access to that control panel?

A    Our electrician.

Q    Is he the only person?

A    I think so.

Q    Okay.  And that's the electrician you mentioned that works for the City of Owensboro?

A    Uh-huh.

Q    Yes?

A    Yes.  Sorry.

MR. SCHAD:  We've been going about 50, 55 minutes.  How about we take a little break?

THE WITNESS:  That's fine.

- - - - (OFF THE RECORD) - - - -

(Direct Examination continues by Mr. Schad:)

Q    Okay.  Sir, we were talking a little bit, I think, about the electrical panel, and a few moments ago you showed me photographs 11 and 12.  There's some handwriting on that danger lockout/tagout tag.  Is that yours?

A    Yes.

Q    Okay.  And there's a date on there, May 21st, 2013.  Do you see that?

A    Yes.

Q    Okay.  Prior to that date, when you locked out and tagged out that equipment, had you ever at any point before been asked to lock out or tag out that box?

A    No.  I never have.  First.

Q    First time ever?

A    Yes.

Q    And there's only one person with a key to lock out or tag out that box, correct?

A    Well, I don't understand the question.

Q    Sure.  To lock out and tag out that box, would you have to be able to open the lock, the padlock that's on it?

A    Yes.  Yes.  Yes.

Q    Okay.  And you know what I mean by lockout/tagout, right?

A    Yeah.  That's what I do here.

Q    Okay.  That is a safety term, right?

A    Right.

Q    And the lockout/tagout is a procedure used to turn off power and make sure it stays turned off, correct?

A    Yes.

Q    And you're aware that that's an electrical safety precaution, correct?

A    Yes.

Q    And that's why you have a tag that says, "Danger," because that electrical circuit, if energized, could be a danger, correct?

A    Yes.

Q    And the lockout/tagout, to do that you have to have the key that fits in the padlock on the panel,

51

right?

A     Yes.   That's right.

Q     And there's only one person that you know of that has that key, and that is the electrician, Greg Kelley?

A     That uses that key, that's right.

Q     Okay.   And he works for you?

A     That's right.

Q     So if somebody - - if somebody in the City had asked Greg Kelley to use that key or to lock out or tag out this circuit, is that something that you would have known about in your job?

A     Yes.

Q     In other words, if somebody else who worked for the City or anybody else asked that to be locked out or tagged out, they'd go through you to get to Mr. Kelley?

A     That's right.

Q     That's how the chain of command would work?

A     That's right.

Q     So it would be unusual and you would not expect for somebody to try to go straight to him?

A     That's right.

Q     Okay.   So based on - -

A     No.   Nobody would go straight to him.   They would check through me.

52

Q    Nobody, okay.

And since that didn't - - you don't ever recall that happening before May 21st, 2013, is that why you believe no one ever asked that that be locked out and tagged out before then?

A    I never got that request.

Q    Okay.  From anybody?

A    No.

Q    Okay.  Did you ask an electrical company to help you with that?  I think you said May Electric, right?

A    Yeah.  Because I wasn't familiar with the equipment that was in the panel, so I had them come over to make sure the power was disconnected.

Q    Do you know if Greg Kelley was familiar with how that panel worked?

A    He was familiar with the time clock.

Q    Okay.  Would he be familiar with how to lock out and tag out that box?

A    Yes, if he had to.  He's had that training.

Q    Okay.  Any particular reason why you used May Electric, other than Greg Kelley, on the 21st of May to lockout/tagout?

A    Greg was out of town.

Q    Okay.  Was he on vacation or something?

A    Yes.  Vacation.

Q    If he had been in town or was at work, would your normal procedure be to use him to do that?

A    Yes.  Yes.

Q    Okay.  So using May Electric was just one of those things that wouldn't normally happen but for Mr. Kelley's absence?

A    That's right.

Q    And this isn't something that you would normally bid out or do in any complicated way?

A    No.

Q    Did you just call May Electric and ask them to send somebody over?

A    Yes.

Q    Do you know who it was that they sent over?

A    No.  Don't remember.

Q    Did you go with them?

A    I met them there, yes.

Q    Had they done other work for you before?

A    Yes.

Q    Okay.  Now, you mentioned Beltline as having done these inspections in four separate years prior to this.  Do you remember that?

A    Yes.

Q    Okay.  And is one of the reasons that you asked them to inspect the bridge to help keep the

electrical system working?

MR. MAYER:  Object to the form.

You can answer the question.

Q    Did you ask Beltline to perform those inspections because you wanted to keep the electrical system working?

A    Yes.

Q    And did you ask them to do those inspections because you wanted to make sure that the electrical system would work safely?

A    To make sure it was working, yes.

Q    Okay.  Is one of the reasons that you asked them to inspect to make sure that the electrical system was working safely?

A    I'm assuming safely while they're working on it, yes.  That would be their responsibility.

Q    Okay.  And when you asked Beltline on those four previous occasions to inspect it, do you give them any sort of guidance?

A    No.

Q    What's your marching orders to them?

A    Inspect the system, change lamps, and make any repairs needed.

Q    And what - - when you told them to inspect it, what did you intend for them to do?

A     To inspect it.

Q     Okay.  And inspect, a plain way of saying that is to look at something and check it out, right?

A     Yes.  I didn't give them any guidance.

Q     Okay.  Because they were the professionals?

A     That's right.

Q     But were you clear in your instructions to them to inspect it?

A     Yes.

Q     Okay.  And what did - - did you expect them to look for things that would keep the electrical system from working?

A     I'm assuming in the inspection that would be what they would do, yes.

Q     Did you expect anyone who you asked to inspect the decorative lighting system to look for anything that would make it unsafe?

A     I assume the inspection, whatever that entailed, you know, that was their responsibility.

Q     Would you have thought that it included inspection on the safety aspects of the system?

A     I didn't think about it.  Just asked them to inspect it.

Q     When they did that work, would they give you any sort of written report after that?

56

A    Basically their proposal said inspect, change lamps, and make any needed repairs.  It was all T&M.

Q    Okay.  On any of those four occasions, four years that you had Beltline inspect the decorative lighting system, after they were done on any of those occasions, did you ever talk with them about what they found?

A    That would be in their field report from the tech that was there.  He would write in the footnotes down there what he did.

Q    So every time Beltline inspected, you would get something called a field report?  Yes?

A    Yes.

Q    Okay.  And would the field report that Beltline prepared for you show the results of the inspection?

A    It stated what they did, yes.

Q    Okay.  On any of those field reports that you received from Beltline were there ever any indications that there were any safety hazards with the decorative lighting system on the bridge?

A    No.

Q    In any of the field reports that you received from Beltline were there any indications that any

part of the decorative lighting system did not meet code?

A    No.

Q    Do you know what I mean by "code"?

A    If there is such a code that regulates that type system, I understand what you're asking.

Q    Okay.  I know you're not an electrician, but do you believe that there is some type of code that regulates electrical current?

A    There is code, yes.

Q    Okay.  And by "code," you mean a minimum set of safety guidelines and standards that have to be followed for electrical circuits?

A    Yes.  Definition of code, yes.

Q    Just like a plumbing code or a building code, right?

A    Yes.

Q    And as part of your job, do you help monitor facilities across the City for code compliance?

A    No.  I'm not a code enforcer.

Q    Okay.  Are there code enforcers for the City?

A    Don't know.

Q    Do you know if the City has any people who check building codes or electrical codes or any other sorts of codes that might apply to structures?

A    I don't know.

Q    I asked you about what Beltline might put in their field reports.  What about just conversations they might have to you, or other documents they may have had sent to you, or e-mails, or any other kind of communication?  Would there be anything else other than the field report?

A    No.

Q    Can you ever recall any occasions where Beltline communicated any safety or code problems for the decorative lighting system on the bridge in any way?

A    No.

Q    Never in any field report?

A    No.

Q    Never in any conversation?

A    No.

Q    Never in any e-mail?

A    No.

Q    Okay.  Did you have an individual point of contact at Beltline?

A    Yes.

Q    Who was that?

A    Tim.

Q    Do you know what Tim's last name is?

A    Hess.

Q    Hess?

A    Hess.

Q    Okay.  As facilities manager, did you think that it was important to have professionals routinely inspect the decorative lighting system on the bridge?

A    My job was to keep the lights burning, so that's - - when we had lamps out, I would call contractors and get them fixed.

Q    And did you think it was important to have that done by licensed professionals?

A    Yes.

Q    Okay.  Did you rely on Beltline to perform those inspections and that maintenance?

A    Yes.

Q    What kinds of maintenance would they do?

A    Well, I think you have copies of reports. I don't have them in front of me, but once they inspected, then they would decide what needed to be repaired, so that would be in their report.

Q    Let me ask it in a different way.  Let's look at some of the - - one of the pictures that we have. Picture 6.  It's a picture of the light.  I think you had mentioned that some of the bulbs needed replacing every now and then?

A    Yes.

Q    Would they burn out and a light would go out?

A    Yes.  When it would burn out, it goes out, yes.

Q    Okay.  And there's some bulbs inside of that metal rod that's sticking up there, right?

A    Well, I'm assuming that's the bulb, yeah.

Q    Okay.  So the inspections and the maintenance that you would've asked Beltline to do would have put somebody right up on these type of lights that went across the top of the bridge, correct?

A    I don't know how they would change it if they wasn't.

Q    Okay.  Well, that's what I'm asking.  You'd have to be around the area like it's depicted in this Number 6 in order to do that job?

A    Yes.  Yes.

Q    Do you know if the bulbs would burn out after any particular time, or was it random?

A    It was random.

Q    Okay.  And no one ever asked, no one from the City ever asked you or the electrician who works for you to participate in anything regarding the painting of the bridge, correct?

A    No.

61

Q     All right.  At any point were you aware of any discussions between any of the people who were involved in painting the bridge and the City about turning off the power to the lights?

A     No.

Q     No one ever asked you your opinion or thoughts on that?

A     No.

Q     Okay.  In the past, when Beltline or anyone else has worked on the decorative lights, has the power been turned off?

A     Well, once we turned it over to them, that would be their obligation, would be their responsibility.

Q     So if Beltline was working on it, you would expect them to turn the power off?

A     Yes.

Q     Maybe a better way of asking that is if Beltline were working on it, would you expect them to turn the power off?

A     I would, if I was working up there.

Q     Why?

A     Well, I mean, I don't know what I'm doing. I'd probably be electrocuted, I'm sure.

Q     Do you know what the voltage is that's running through that power line?

A    277, 480.

Q    Would you have expected that anyone who was performing work in or around the light that you see in photograph Number 6 would've had the power off while that was happening?

A    I know I would.

Q    Okay.

A    I don't know what to expect out of someone else, but I know I would.

Q    Well, if one of your employees or someone you were responsible for was up there, would you have insisted that the power be turned off?

A    Definitely.

Q    And it's the City that has the key to turning off the power, right?

A    Correct.

Q    No one else has the key or the ability to turn off the power to the bridge, other than the City of Owensboro?

A    That's correct.

Q    You have to go through the City of Owensboro if you want the power turned off to the decorative lighting system?

A    That's correct.

Q    And they'd have to go through you in

particular?

A    Yes.

Q    Now, if someone asked you to do that, is it hard?

A    No.

Q    How long does it take?

A    Probably, once you're on site, probably less than five minutes to shut it off, lock it out.

Q    If anyone had asked you or said, "We need you to go de-energize the bridge," could you have done it without much trouble?

A    Yes.

Q    And do you believe it's well known that that's something that your office could do?

A    Yes.

Q    And there's no - - as far as you know, there's no ambiguity or it's not unclear who you'd call in the City if you needed to have that power turned off, right?

A    Yes.

Q    You're the guy?

A    I'm it.

Q    And would you expect other City employees to know that?

A    Well, not all City employees know that.

64

Q    Would you expect Mr. Schepers to know that?

A    No.

Q    Why not?

A    I mean, he has - - he has nothing to do with lighting.  I don't know how he would've known who to call.

Q    Do you have to work with OMU at all to turn the power off to the lighting?

A    No.

Q    Is there any reason to need to involve OMU in de-energizing the bridge at all?

A    Unless our switch gear failed.

Q    Has that ever happened?

A    No.

Q    And, in fact, the power has only been turned off that one time, May 21st, 2013?

A    I mean, I don't know that that's the only time it's ever been turned off.

Q    I guess a better way to ask is you only - - your personal knowledge of the power being turned off is limited to that one occasion; is that right?

A    Yes.

Q    Okay.  Now, at some point on that day or close to that day, May 21st, you got asked to de-energize the bridge, right?

65

A    Yes.  It was 7:15, on the 21st, a.m.

Q    That's pretty specific.  How do you remember it with that sort of - -

A    Because I remembered it in my report.

Q    Okay.  Who asked you to do that?

A    Joe Schepers.

Q    And if you look on Exhibit 13 - - would you just take a look at Exhibit 13 for me, if you could?

A    I thought we was looking at pictures.

Q    Well, we may go back and look at those, but we're going to move on to this one.

Is this your report?

A    Yes, it is.  Oh, it's on my division letterhead.  Didn't remember.

Q    I just want to kind of briefly go through some of the timeline on this.  So you got a call or - - was it a call or an e-mail, or how did it work, at 7:15 a.m.?

A    Personally Joe stepped in my office.

Q    What did he tell you?

A    He asked that I would de-energize the bridge lighting, decorative lighting.

Q    Did he tell you why he needed that to be done?

A    I don't have it in my report.  I don't

think he did.  He just asked if I could do it, if I had the ability to do it.

Q    At the time did you have any idea what that was about?

A    Oh, yes.  I'd already heard about the incident.

Q    Okay.  About Mr. Gonzalez dying?

A    Yes.

Q    Okay.  Did you assume that this had something to do with that?

A    Assumed it did, yes.

Q    Did Mr. Schepers talk to you at all about Mr. Gonzalez's death?

A    Not that morning, no.

Q    Okay.

A    He didn't go into any detail that I remember.

Q    Did he at any point after that?

A    Yes.  We had discussions because we met the coroner up there.  I got a contractor up there to assist.  Yeah, we did have a conversation regarding it.

Q    And tell me about that conversation.

A    Don't remember.

Q    Was it that same day?

A    Yes.  I'm pretty sure.

Q    Let's go through the timeline here.  What did you do at 7:24?

A    I contacted Dale Harris with OMU.

Q    Can you explain what you mean by that entry?  You said earlier you wouldn't need them to turn the power off.  I'm not sure I understand.

A    Well, the electrician was out of town, so I was just familiarizing myself with what was down there before I got anybody on board to help me take care of it.

Q    Okay.  What happened at 7:45?

A    We de-energized it.

Q    Okay.  You had May Electric down there too?

A    Uh-huh.

Q    Yes?

A    Yes.  I'm sorry.

Q    It's okay.

So once you got the request, this happened pretty fast?

A    Yes.

Q    Within 30 minutes, you had contacted an electrician and the power was turned off?

A    Uh-huh.

Q    Yes?

A    Yes.

Q    Okay.  And was it your understanding that

this was an urgent thing, that it needed to be done quickly?

A    Well, I mean, it didn't take long to do it, so, yeah, I got right to it and got it turned off.

Q    And if you had been asked to turn it off before this day, would it have also been pretty routine for you to have this done within a half an hour, an hour, two hours?

A    Yes.  A lot faster if my electrician was in town.

Q    So if your electrician were in town and you had had a call from anybody to de-energize the power, you could've had it done even quicker than this?

A    Depending on the time of day it was, yes.

Q    Okay.  So 8:50, what happened?

A    We checked the time clock and everything to make sure everything in the panel was operating properly, and it was.

Q    8:51, what happened?

A    I think Greg finally called me back.  He was out of town.  I was verifying that - - I think I was making sure that was the only power source to that lighting.

Q    Okay.  So you called him, I guess?

A    Yeah.  I had called him, yeah, because I

was needing information.

Q    9:45, the lockout/tagout is mentioned in that note.  That's a little bit different than just turning off the power?

A    Yes.

Q    What is that?

A    That is indicating to anyone that walks up to those panels that they've been locked out and they're not to be tampered with.

Q    Okay.  9:49, what happened?

A    I contacted Joe.  System had been de-energized.

Q    And then, finally, what happened at 11:30?

A    I also had OMU come down and disconnect their - - they pulled the meter on that service so there was no chance of it ever coming back on.

Q    Why pull the meter?

A    Well, at that point I just didn't want to take any chances.  I knew we had to disconnect from the lighting system controls on our side, de-energized, but I wanted to go a little step further and have the meter pulled so it was ever no chance.

Q    No chance of someone being electrocuted?

A    That's right.  Anything else happening at that point.

70

Q    Was that hard to do?

A    No.

Q    Okay.  So it sounds like you really took three separate safety precautions to keep people from being electrocuted after May 21st.  You de-energized the panel?

A    Yes.

Q    You pulled the meter, and you locked it out and tagged it out?

A    That's right.

Q    Okay.  And those were all precautions to keep people from being electrocuted?

A    Yes.

Q    Was there any other reason that you did those three things?

A    Other than I was asked to do it.  No other reason.

Q    Were you asked to take all three of those steps, or were you just asked to de-energize?

A    Just de-energize.

Q    Okay.  So the specific things you did, that was your call?

A    Right.

Q    Okay.  There's an update on May 22nd.  Looks like you talked to OMU that morning?

71

A    Uh-huh.

Q    Yes?

A    Yes.  Sorry.

Q    That's okay.

And then last entry, 9:27.  Electrical meter was removed and capped and electrical power cut off from the bridge?

A    Yes.

Q    Now, after that entry on that date, have you performed any other kind of work or inspection on the electrical system for the decorative lighting at the bridge?

A    No.

Q    Have you participated or talked with any other individual or company about any other inspections that would take place on the bridge?

A    Yes.

Q    Who else have you talked to?

A    Beltline.

Q    Okay.  And tell me when that conversation or communication took place.

A    Well, this here was November - - it must have been November.  Early November, I think.

Q    Of 2013?

A    Yes.

72

Q    Okay.  And what did you ask Beltline to do?

A    To complete an inspection, replace any burnt-out lamps, and get the system back in operation.

Q    Okay.  Was that your decision to initiate that, or did someone else in the City ask you to make that happen?

A    I was asked.

Q    Who asked you?

A    I think it was Joe.

Q    Okay.  So you called Beltline in November 2013, and at that time the lights were still de-energized, correct?

A    That's correct.

Q    And they were still locked out and tagged out with the box removed?

A    Yes.

Q    Okay.  So did Beltline inspect it?

A    No.

Q    Did they do anything?

A    No.

Q    Why not?

A    I was asked to cancel that order.

Q    Who asked you to do that?

A    It was Joe.

Q    Okay.  Any other occasions that you can

think of after the lockout/tagout where there was any discussion or anything else about inspecting the decorative lighting system?

A    Yes.

Q    Okay.  And what was that?

A    Well, we contracted someone to do an inspection on it.  I wasn't involved in any of that.  Only part I played in that was removing our locks from the panels.

Q    Okay.

A    And I left.

Q    Was that this past September?

A    Don't remember.

Q    Okay.  So was it this year?

A    Yes.  Pretty sure.

Q    Few months ago?

A    I think so.

Q    There's a festival in Owens - - I don't know if you know.  I think it's a festival where they close down the bridge and you can walk on it, right?

A    Uh-huh.

Q    Yes?

A    Yes.

Q    That's okay.  What's that called?

A    I think it's called Bridge Day.  I don't

participate in it.  I don't have any involvement in it.  I think it's called Bridge Day.

Q     You're not responsible for any of the planning or maintenance for that day?

A     No.

Q     This inspection, do you know if it happened before or after that day?

A     What inspection are we talking about?

Q     You said that you knew of, but did not participate in, except for removing the lock, another inspection of the bridge that was a few months ago.  You know what I'm talking about?

A     Yes.  What's your question?

Q     Did they ask you to remove that lock before or after the Bridge Day?

A     Oh, that I don't remember.

Q     Okay.

A     I just got a call to come down and remove the locks.  That's what I did.

Q     Who called you?

A     Joe.

Q     And did you get that done pretty quickly?

A     Yes.  I mean, it was scheduled, obviously.  The asked time to be there, I was there.

Q     And you took the lockout/tagout stuff off

75

of the control panel, right?

A    Yes.

Q    Okay.  And that's the extent of your interaction with that?

A    Yes.

Q    Have you ever talked to anybody from Spartan Contracting?

A    No.

Q    Have you ever talked with anybody from the Kentucky Transportation Cabinet about the decorative lighting system of the bridge?

A    Yes.  There was a meeting we had with the state.  I was present.

Q    Was that the pre-construction meeting?

A    No.

Q    Was it after Mr. Gonzalez's death?

A    Yes.

Q    Okay.  Tell me what you remember being said at that meeting about the electrical lighting system or Mr. Gonzalez's death?

A    We were not going to be allowed to bring it back on.

Q    Was that recently?

A    That was in November.

Q    November of this year?

A     I'm thinking it was, yeah.

Q     You've answered a lot of questions and I want to make sure we get some of the timeline straight. The meeting with the Kentucky Transportation Cabinet, was that very recently or was that last winter?

A     It was in November '13.

Q     This past November?

A     Uh-huh.

Q     And they told you that the City couldn't turn the power back on?

A     Yes.

Q     Okay.  Do you know who from the Kentucky Transportation Cabinet said that?

A     No.  I didn't take any notes in the meeting.  I don't know who it was.  There were several in the room.

Q     What was the reason that they gave you?

A     I think they said until the system met code or was made safe.  I'm not sure exact words that were used.

Q     Did somebody tell you that the system was not up to code?

A     No.

Q     Was that mentioned at this meeting with the Transportation Cabinet?

A    No, because I don't think anybody really new or understood what the code would be, if there was one, for that type thing.

Q    I guess I'm a little confused.  You were told that you couldn't turn the power back on to the lights because it had to be up to code, right?

A    If there was such a code.

Q    Okay.  Was there words used, "If there was such a code," or is that just something that you're thinking?

A    No.  We had that discussion because then I think I may have been the one to ask, you know, what is the code, is there a code that regulates that type of lighting.  I don't think nobody knew.

Q    And how many people were at that meeting?

A    Ten, ten, fifteen people, I guess.  Quite a few.

Q    Who from the City was at the meeting where the Transportation Cabinet told the City that they couldn't turn the lighting back on?

A    Joe, Kevin Culligan, and myself.

Q    Do you know what code it is that controls the lighting?

A    No, I do not.

Q    Have you even ever heard of the National

Electric Code?

A    Yes.

Q    All right.  How have you come in contact with that before?

A    Documents, and I know they exist.

Q    Did you ever see any letters from the Kentucky Transportation Cabinet to the City that the lighting needed to remain off?

A    No.

Q    There's some notes of a meeting from December 3rd of 2013, which would've been about a year ago.  Do you know anything about that meeting occurring between transportation and the City about the decorative lighting?

A    I'm assuming that's the meeting we're talking about.

Q    Okay.  So a couple of minutes ago when you said last November, you're not talking about a month ago; you're talking about a year and a month ago?

Let me see if I can - -

A    Last November is when we had the meeting.

Q    Okay.  Sometimes you say "last November," and when you say that, I thought a month ago.

A    No.  2013.

Q    You mean last year?

A    Yes, 2013.

Q    Got you.

A    Yeah.

Q    And since then have there been any efforts that you know of to bring the lighting back up to code?

A    No.

Q    Has anyone from the City had conversations with you about it's not up to code?

A    No.  Talking about after the meeting with the State?

Q    No.  Before?

A    Before, yes.  I was instructed to bring them before - - I don't remember the exact date.

Q    Instructed by who?

A    Joe.

Q    And what were you instructed to do?

A    To get the lights system inspected and any repairs completed and make sure all the lights were burning.

Q    Okay.  Was that after the Gonzalez death but before the meeting with Kentucky Transportation?

A    Yes.

Q    Okay.  So you had marching orders to get these lights back on?

A    Yes.

80

Q      And as part of those discussions was there anything said about the code or bringing it up to code?

A      No.

Q      Okay.  Was it your understanding that you had to see if it was up to code or do anything to bring it up to some standard?

A      No.

Q      Okay.  Have you seen the inspection report that was done by this other electrician?

A      No.

Q      Have you talked with anybody about it?

A      No.

Q      Are there any plans that you know of right now to re-energize the lighting on the bridge?

A      No.

Q      Would you do that?

A      If I was instructed to, yes.

Q      Okay.  Those are all my questions.  Thank you.  There may be some other questions from other - -

CROSS EXAMINATION BY HON. CHRISTOPHER M. MAYER, ATTORNEY FOR BELTLINE ELECTRIC:

Q      Mr. Tong, my name is Chris Mayer and I represent Beltline Electric in this lawsuit.  Counsel was very thorough, so I just have a few questions, I think, but I may jump around a little bit.  So if I ask you a

question that you don't understand or doesn't make sense to you, or you can't hear me, just let me know.  Okay?

Counsel, can you hear me on the phone?

MR. EDWARDS:  Yes.

MR. MAYER:  Okay.  Great.

(Cross Examination continues by Mr. Mayer:)

Q     Listening to your testimony so far today, Mr. Tong, I get the impression that your goal with respect to the blue bridge, as I'll call it, was to make sure that those lights were lit up at night.  Is that fair to say?

A     Yes.

Q     Okay.  We talked about the safety department for the City of Owensboro and then the maintenance department.  The hat that you wear is in the maintenance department, correct?

A     Yes.  Yes.

Q     Not the safety department?

A     Yes.

Q     Okay.  You mentioned that these lights were inspected, I believe you said in 2004, 2006, 2008, and then 2011.  Is that right?

A     Yes.  Yes.

Q     And it was your understanding that Beltline was involved with checking those lights on all of those occasions?

82

A    Yes.

Q    Are you familiar with Dyna Electric or Dynalectric?

A    Dyna - - it originally was Dyna, and then I guess it became Beltline at some point there.

Q    I'll represent to you for purposes of our discussion that those are two separate companies.

A    Totally different?  I didn't know that.

Q    Okay.  That being your understanding or perhaps lack thereof, do you believe that Dynalectric may have been involved with inspecting those lights at any time prior to this incident?

A    Yes.

Q    Okay.  It could've been Dynalectric?

A    Right.

Q    Okay.  I'll represent to you that my client, Beltline, was on the bridge in October of 2011. Do you have any knowledge as to whether any Beltline employees had been up on that bridge prior to 2011?

I'll ask it a different way.  Specifically, do you recall it being Beltline up there as opposed to Dynalectric prior to 2011, or do you know one way or the other?

A    Well, I don't have my invoicing here, but it seems like 2008 it was Beltline.  I'm not totally sure

83

about that.

Q    Next question was going to be, do you have any documentation of any servicing done to those lights prior to 2011?

A    Yes.  I mean, I have submitted invoices.

Q    Okay.

A    Repairs that were completed before 2011.

Q    Have you ever worked with Dynalectric prior to 2011, before it went out of business or closed its doors?

A    Well, I'm assuming I did, because some of my invoices for repairs was a Dynalectric invoice.

Q    Do you remember who the contact person at Dynalectric was?

A    No, I do not.

Q    Do you know if it was someone other than Tim Hess, who is now with Beltline?

A    Could have been, yeah.

Q    Okay.  We talked about the hats that you were wearing, the maintenance hat as opposed to the safety hat.  You testified just a few minutes ago that you did not know if there was a code that applied specifically to the decorative lighting system.  Is that your testimony?

A    Yes.

Q    Did you ever have a conversation with Tim

84

Hess at Beltline about whether these lights were up to code?

A    No.

Q    Did you ever ask him to have anyone on behalf of Beltline offer an opinion about whether they were up to code?

A    No.

Q    Your concern was to make sure that the lights were turned on?

A    That's right.

Q    Okay.  Was it your understanding that they were performing any assessment for the City about whether those lights were up to code?

A    No.

Q    Okay.  Have you had any discussions with anyone on behalf of Beltline at any time about whether that decorative lighting system was up to code?

A    No.

Q    When you had Beltline go up to do work on the decorative lighting system, did you ask them to take any photographs?

A    I think one time they did, but, no, I never asked them to.

Q    Okay.  Do you know, if photographs were taken - I know there's some confusion about Dynalectric

versus Beltline - do you know if those may have been done by some time prior to 2011?

A     Photo was just in the file loose.  It wasn't attached to any document, so who actually took that photo, I couldn't say.

Q     Okay.  Do you know what those photographs were showing?

A     It was a picture similar to one of the light fixtures here.

Q     Do you know why it was taken?

A     I think there was an area in the cable that was - - they repaired.

Q     Okay.  Is it your understanding that what Beltline was hired to go do to the lighting system - - and I'm going to talk specifically about October of 2011, is it your understanding or was it your goal to have them go up there to change the light bulbs, if necessary, and if after changing the bulb the light did not come on, troubleshoot to see what was causing them not to come on?

A     Yes.

Q     Okay.  The words you used - I wrote it down and hopefully I wrote it down correctly, if you bear with me for a second - was to troubleshoot, replace burnt out lamps, and check for deficiencies.  Is that correct?

A     Yes.

Q    Okay.  When you talk about troubleshooting and looking for deficiencies, are you talking about things that may prevent the light bulbs from coming on?

A    Yes.

Q    Nothing else, correct?

A    No.

Q    Okay.  As I understand it, more recently an outfit named URS came to do an inspection of the light bulb system.  Is that right?

A    I heard that, yes.

Q    And throughout your deposition today, the word "inspection" has been used quite frequently and it hasn't necessarily been defined, okay, so I'm going to try to define it.

When you say that Beltline was hired to go and inspect the decorative lighting system, what parts of the lighting system specifically were you having them come out to inspect?  The light bulb itself?

A    I mean, the whole system basically, to make sure everything is operating properly.

Q    Okay.  We talked about the panel down where you can de-energize the line or not.  Were you having them come to inspect that as well?

A    Well, it's part of the system.  If they deemed there was a problem with it, yeah, inspect it to

find out what that problem was, and repair it.

Q    Okay.  If what it was was causing the lights not to come on?

A    That's right.

Q    Okay.  Did you ever ask anyone on behalf of Beltline to take any video of their work?

A    No.

Q    As I understand it, as part of Beltline's work, the City was actually providing materials.  Is that right?

A    That's right.

Q    What materials were provided?

A    Caulking and lamps, fixtures.

Q    I think rags, too.  Do you remember them being provided?

A    My electrician may have handed them a box of rags or something.  I don't know that.

Q    Okay.  So what Beltline was being provided was the light bulbs, the caulking, and then possibly the rags?

A    No.  We provided that.

Q    Right.  Oh, I'm sorry.  Okay.  You're right.  I asked the question incorrectly.

Was the City providing anything else?

A    No.

Q    Did they provide any wiring?

A    No.

Q    Did they provide - -

A    Not to my knowledge.

Q    Okay.  Where would any of the materials that were provided to Beltline, who would provide them, from the City?

A    Where would we purchase them from?

Q    Yes.  Well, no.  Who would actually coordinate getting those materials?

A    Greg Kelley, our electrician.

Q    Okay.  It sounds like you're not as familiar with the work that was performed by URS back in Summer of 2014.  Is that right?

A    I don't know anything about that.

Q    Okay.  I want to ask the question to be thorough.  Do you have any understanding as to how much they were paid to do their examination?

A    No.

Q    In this case Beltline charged - - I believe they billed $7,722 to the City for its work in October of 2011.  Does that sound about right to you?

A    I think it does, yeah.

Q    Did anyone on behalf of Beltline represent to you that they were doing anything other than going up

to replace the light bulbs, where appropriate, and if any other steps needed to be taken to make sure those bulbs worked after they were placed, that they would do so?

A     No.

Q     And you were not expecting Beltline to offer any opinions to you as to whether that decorative lighting system was up to code; is that fair to say?

A     No.  I never asked them that.  Had no reason to, because the system was approved when it was installed, and we've not made any changes to it.

Q     Well, that's a good segue to my next line of questions.  It sounds like you were hired by the City in 1994, which I think was right before this decorative lighting system was installed?

A     Yeah, I think just right there.  It wasn't my project.  Wasn't involved with it.  I don't know anything about the installation of it.

Q     You answered my next question, but let me ask you this.  Do you know if, when that decorative lighting system was installed, whether it was inspected to determine whether it was up to code?

A     No, I do not know that.

Q     Do you know if - - this is dating back a long time ago.  Do you know who on behalf of the City of Owensboro was working on this project?

A    No.

Q    As I understand it, the lighting system was originally purchased by the Owensboro Development Group or something to that effect.  It was not the City of Owensboro?

A    I don't know.

Q    You don't know.  Okay.  That's fine.

Have you seen any documents regarding the initial inspection of the decorative lighting system before it was first energized and put into operation?

A    No.  No.

Q    On the occasions before October of 2011 - - and I represent to you that's when Beltline went up on the bridge to replace some light bulbs.  Okay?  On the occasions where the bulbs had been replaced on prior occasions, did you have whoever that entity was perform any evaluation as to wether the system was up to code?

A    No.

Q    Was there anyone on behalf of the City of Owensboro who was in contact with Beltline to coordinate this effort?

A    Repeat that.

Q    Yeah.  I'll ask it a more simple way.

Were you the contact person for Beltline?

A    Yes.

91

Q    Okay.

A    Well, initially, to get the contract, and then my electrician met with them if they needed anything, basically.  He kind of oversaw what they were doing.

Q    In terms of what they were doing in October of 2011, did you ever visit the bridge while they were working on it?

A    No.

Q    You were not asked to de-energize the line during that work?

A    No.

Q    You don't have any knowledge as to whether the line was de-energized while Beltline was doing that work?

A    No.  Not - - no.

Q    Prior to the incident involving Mr. Gonzalez, do you know if the City of Owensboro ever had anyone go up and inspect the decorative lighting system to determine whether it was up to code?

A    Did the City of Owensboro have anyone?

Q    Yes.

A    Yes.

Q    They had someone go up there prior to this incident for the specific purpose of determining whether it was up to code?

A    No.

Q    Okay.  That was my question.  Okay.

A    No.  Never had anybody.  Never asked anybody to tell me whether that system was up to code or not.

Q    Okay.

A    Thought I already answered that.

Q    Well, I asked that question regarding Beltline, and I'm asking about any other entity.

A    Okay.

Q    So I'll ask it again just to make sure we're clear.

Do you know if the City of Owensboro had ever retained any company, prior to the incident that brought us here today, to go up and inspect the decorative lighting system to determine whether it was up to code?

A    No.

Q    As I understand it, that decorative lighting system was installed in 1995, by Garfield Electric.  Do you know anyone on behalf of Garfield?

A    No.

Q    I believe they are no longer operating, but have you spoken with anyone on behalf of Garfield about the decorative lighting system?

A    No.

Q    I'm sorry.  I'm going through my notes for a second.

A    That's okay.

Q    Good thing is that means I'm probably almost done.

I think that's all the questions I have.  I appreciate your time today.

A    Okay.

CROSS EXAMINATION BY HON. KERRY D. SMITH:

Q    Mr. Tong, my name is Kerry Smith and I am representing eight current or former Kentucky Transportation Cabinet employees that have been sued individually.

And you have been questioned so thoroughly that there's almost nothing left that I can ask you, but I'm going to try, if you will indulge me.  I'm going to have to skip around because I don't want to go over the same ground twice.

A    That's fine.

Q    If I ask you about something, again, please indulge me.  It's just because I don't remember what a previous answer may have been.

In May of 2013, what was your job title and duties?  The same as today?

A    Same, yes.

94

Q    Okay.  In the chain of reporting that you mentioned, Greg Kelley reported to you; you reported to Mr. Shelton; and Mr. Shelton reported to Mr. Ray.  Was it the same then, in May of 2013, as it is now?

A    Yes.  Actually, Lelan Hancock is who I reported to.

Q    I'm sorry?

A    Lelan Hancock is who I reported to.  He's the deputy director of operations.

Q    Okay.  And then he reports to?

A    To Wayne.

Q    All right.  When we're talking about lights that are on the bridge, we've been talking, I think, about decorative lights today, right?

A    Yes.

Q    Okay.  There are navigational lights for mariners?

A    Yes.

Q    So when you talk about lights, you're not talking about the navigational lights, are you?

A    They're not my responsibility.

Q    Right.  The City, to your knowledge, does the City even own the navigation lights?

A    Don't know.

Q    Okay.  Good answer.

How about street lights?  Are we talking about street lights?

A    Don't know.

Q    No.  I'm saying when we've been talking about lights today, you haven't been talking about street lights, have you?

A    No.  It's been the decorative lighting.

Q    So all of our discussion thus far today has been about decorative lights?

A    As far as I can tell.

Q    And, to your knowledge, does the City own the decorative lights?

A    Don't know.

Q    To your knowledge, does the City pay the electric bill for the decorative lights?

A    Don't know.

Q    But you did say that the City is the only entity that has a key to the electrical box that can turn the lights on and off; is that correct?

A    My division maintains the lighting on top of the bridge.

Q    But back to my question.  The City is the only entity that has a key that can get into and out of that electrical box to turn the lights on and off, right?

A    Yes, I'm assuming.

Q       Okay.  And that's the same - - I'm sorry?

A       As far as I know, we was the only ones that have that key.

Q       And that answer is the same in May of 2013; the City, as far as your knowledge, is the only entity that had a key to that electrical box?

A       As far as I know.

Q       In May of 2013, did anybody from Kentucky Transportation Cabinet, to your knowledge, have a key to get into that box to turn the lights on or off?

A       Don't know that.

Q       Do you know if there was an electrical permit originally issued for the electrical service to those lights back when it was built?

A       Don't know.

Q       Where would I go to get that?

A       I don't know.

Q       You had mentioned that a timer brings the lights on and off.  How do you know that?

A       From my electrician.

Q       Mr. Kelley?

A       Kelley.

Q       To your knowledge, at any time say within the past five years, has the on and off time been changed for when the lights come on or go off?

A    Yes.   Because the time changes and we have to change it - -

Q    Okay.   Let's go back to the year 2013.   Do you remember the last time that the adjustment was made for the lights to come on or go off before the accident that took Mr. Gonzalez's life?

A    No.   Huh-uh.   No.

Q    You don't know?

A    Huh-uh.

Q    Who would know?

A    I don't know.

Q    Okay.   On that electrical box, do you know if either the street light, the circuits for either the street lights or any other type of lights run through that box?

A    No.   It's my understanding that nothing else but the decorative lighting is in that service.

Q    And that was my next question.

Prior to the accident on May 20, 2013, did you have any interaction with anybody at the Transportation Cabinet regarding the decorative lighting?

A    No.

Q    Prior to the accident on May 20, 2013, did you have any interaction with anybody at Spartan regarding the decorative lighting?

98

A    No.

Q    With regard to anything?

A    No.

Q    Did you ever have any personal dealings with Nick Gonzalez?

A    No.

Q    Did you have any involvement in a pre-construction meeting for the bridge re-painting job?

A    No.

Q    Prior to the accident do you know if anyone - Spartan, Transportation Cabinet, anybody - made any request that the lights be de-energized?

A    No.

Q    When did you first learn that there was a request that the lights be de-energized?

A    7:15 a.m., May 21st.

Q    The week before the accident, had anybody had any discussion, e-mail, text message, any form of communication with you regarding the decorative lighting?

A    No.

Q    You said on May 21, 2013 that Mr. Kelley was out of town on vacation?

A    Yes.

Q    Do you know when he returned from vacation?

A    I'm not quite sure.

Q    Do you know when he left for vacation?

A    No.  I don't remember that date.

Q    Do you know if Mr. Kelley was at work the week before May 21st, 2013?

A    Yes.  Pretty sure.

Q    He work through Friday of that week?

A    Pretty sure.  I don't have a calendar in front of me so it's a little difficult, but I think he was there the week prior to that, yes.

Q    All right.  So when he left for vacation - - you don't know when he left, right?

A    No.

Q    Okay.  Do you know when the electrical box that controls the lights - - has there always, to your knowledge, been a padlock on that?

A    Yes.

Q    Since its existence?

A    Yes.

Q    To your knowledge, has anybody else had a key to that box?

A    No.

Q    And by anyone else, I mean aside from the City.

A    No.

Q    Anybody else at the City have a key to that

box?

A    No.  Well, we keep spare keys locked up.

Q    In case you lose yours?

A    Yeah.  I have to have back-ups.

Q    Who is Gayle Shockley?

A    She's our office manager.

Q    I saw that name on the - - here, I'll hand it to you.  There's some documents I e-mailed to counsel yesterday.  That's Number 9, and that's your signature below her name?

A    Yes.

Q    And that's where you were approving payment to Beltline for the work they did in 2011?

A    Yes.

Q    Do you know an Austin McLimore, M-c-L-i-m-o-r-e?

A    No.

Q    Do you know a Nick Aull?

A    No.

Q    You don't?

A    Don't know that name.

Q    Just for identification purposes, this document is marked DX 11.  It looks like an invoice from May Electric.  Can you tell me what that's for?

A    Well, looks like the description of this,

looks like the day they had to - - we had them there the 21st to disconnect the power.

Q    So is that a record where May Electric charged -

A    Yes.

Q    - the City -

A    Uh-huh.

Q    - for the work you had -

A    Yeah.  That's right.

Q    - since Mr. Kelley was out of town, to turn off - -

A    That's correct.

Q    You'll need to leave those with our court reporter.

And, just for purposes of identification, this document marked DX 16, is that the Post Incident Report that you were talking about earlier that you prepared?

A    Yes.

Q    At the bottom of the report it says that you and Andrew Osborne were on-site.  Tell us about who Mr. Osborne is and what his duties are.

A    I called Andrew.  I didn't have any lockout/tagout on my truck, so I called him to bring me enough to lock out the panels there.  He dropped them off and left.  Basically all.

Q    So, to your knowledge, did he have any involvement other than what you just - -

A    No.  That was it.

Q    What is his job duty, job title and duty?

A    He's a building specialist.  He maintains my swimming pools.  Does a lot of my plumbing work, irrigation equipment.

Q    Does he do electrical work?

A    No.  No electrical at all.

Q    So his sole purpose of being called was because he had a tag?

A    Yeah.  Actually, he had to go buy some because he didn't have any.  He's not an electrician, so he had to stop and buy some locks and tags.

Q    Did he have any involvement other than what you've just described with respect to these decorative lights?

A    No.  He's never had any involvement in the bridge lighting at all.

Q    Anybody else from the City there at the time you're referring to in your report?

A    No.  Just Andrew and I.

Q    This is a document that we've looked at earlier that I was e-mailed by Mr. Harvey this morning. It's marked DX 17, and it looks like a proposal or maybe

an analysis prepared by URS.  Have you ever seen that before?

A    No, sir.

Q    You know anything about it?

A    No.  No, sir.

Q    Let me hand you - - that's fine.

This document is marked DX 18.  It looks like an electric bill from OMU to the City of Owensboro.  You ever seen that or anything like that before?

A    Well, I've seen their billing printouts before.

Q    Do you know what that is with reference to what electrical service that deals with?

A    I wouldn't know.

Q    You were talking earlier about a meeting in November of 2013, where you and Mr. Culligan and Mr. Schepers and some KYTC people were at a meeting.  Where was that meeting held?

A    Madisonville.

Q    And then you made a reference to a code, and that, if I understand correctly, if there were such a code.  Is that what you said?

A    Yeah.  I think that's something I asked in the meeting.

Q    Which version of the code was under

104

discussion?  The one that was in effect back when this decorative lighting system was installed, or the current version of the code?

A    Yes.  When it was installed, I think, is what I was referring to.

Q    You were referring to that?

A    Yes.

Q    And the question was whether or not it met the old code or the current code, when you said, "bring it up to code"?

A    I didn't say bring it up to code.

Q    Okay.

A    I just - - my question was, was there a code.

Q    As of when?

A    I think the state had asked that we could not bring it back on until it met current code, I think, is what they said.  I asked, did it meet code when it was installed, because we had not made any alterations to that system since it was approved and been installed.

Q    So your understanding was that the state wanted it to meet the current code?

A    Yeah.  Assuming, yes.

Q    Okay.  And do you have any knowledge as to whether or not it met the code back - - the older version

of the code, back when it was installed?

A    No.

Q    You don't know one way or the other?

A    No.

Q    Thank you.  No further questions.

MR. EDWARDS:  I have no questions for Spartan.

MR. SCHAD: I have just a few follow-up.

REDIRECT EXAMINATION BY MR. SCHAD:

Q    You said that on one occasion Beltline took photos of the cable that had been repaired and provided them to you, correct?

A    I'm saying someone did.  Somebody.  I don't know if it was Beltline or Dyna.  That's two different companies, which I ain't familiar with that.

Q    At some point an electrical contracting agency that the City paid gave you, on behalf of the City, pictures of a cable that had been repaired on the decorative lighting system on the bridge?

A    A picture, yeah.  It was only one.

Q    What was wrong with the cable?

A    I think - - I'm not sure.  I'm not sure exactly what it was.  Shown like a little burnt spot or something on the cable.

Q    Like a wire?

A    Yeah.  It's in the photo.

106

Q    Okay.

A    I don't remember exactly what it looked like.

Q    All right.  It was a problem with the cable?

A    Yeah.

Q    Okay.  And it's something that that electrical contractor saw -

A    Uh-huh.

Q    - and took a picture of, and gave to you?

A    And repaired it.  He repaired it.

Q    And repaired it?

A    Uh-huh.

Q    And this is before the bridge gets painted?

A    Yes.  I'm pretty sure it was, yeah.

Q    And was it pretty clear to you at that point that, at least on one part of the cables on the electrical system for the bridge, there was a problem that had to be fixed?

A    Yes.

Q    Okay.  And was it insulation on a cable that looked like it had been burnt or worn away?

A    Yeah.  It was insulation, yes.

Q    Okay.  And - -

A    It was on one of the large, large cables.

Q     Okay.  When you say "large cables," can you be more specific for me?  You mean like great, big conduits, or small - -

A     Well, they're probably half-inch cables, run down on both sides.

Q     Okay.  Is that the one that runs along the metal part of the bridge?

A     Uh-huh.  It's got the insulators on it.

Q     Okay.  So you knew prior to the bridge being painted that the cable that supplied power to the decorative lighting system, part of it had problems or been defective even before the bridge got painted?

A     Yes.  I also knew it got repaired.

Q     Okay.

A     Another thing, that system, the way it's designed is, it is designed in a manner that no one should be around that system as long as it's energized.  It's not in an area where the public can get to it.  Only one around that system would need to be authorized to be in that area to start with.  That's the way it's designed. It's not in conduit.  I didn't design it and I don't know if any code back then regulated that, but that's the way it was approved.  That's the way it was installed.

Q     Are we talking about the area that they took a picture of and gave to you?

108

A    Yes.

Q    Okay.  So that area was part of an insulated wire that was not in conduit, right?

A    Exactly.

Q    An exposed wire?

A    Yes.

Q    Correct?

A    Uh-huh.

Q    Okay.  And it sounds like one of the reasons that wasn't a big deal was because people wouldn't be around it?

A    Well, I mean, it was a big deal if it was not working, the system wasn't working, but, yeah, I mean, nobody unauthorized are supposed to be in that area or should be in that area at any time.

Q    From a practical standpoint, it wasn't a problem because it didn't keep the wires - - didn't keep the lights from coming on, right?

A    I don't remember.

Q    All right.  And from a safety standpoint, it didn't seem like a problem to you because people wouldn't be around that wire, right?

A    Yes.

Q    Okay.  If it were a wire in a place where people could come in contact with it, it would have been a

safety concern for you, correct?

A    Yes.

Q    Because it could've electrocuted somebody?

A    Unauthorized.  Somebody in that area that's unauthorized would definitely be.

Q    So what you saw in that picture definitely would've been a safety hazard to anyone who would've been close to it?

A    Anyone unauthorized that were up there with the system energized, yeah.  Could be a potential hazard there, for sure.

Q    Do you remember what part or span of the bridge that defected wire was on?

A    It was more on the Indiana side.  I remember that.

Q    Okay.

A    The tarps were off, it was kind of hard to get your bearings when we were up there, but it was closer to the Indiana side.

Q    Okay.

MR. HARVEY:  I think he's answering something different than what you're asking, Matt.

Q    I think you are, too.

I want to make sure we're clear, on the picture, what you mean by the picture.

A    Oh, okay.  Sorry.

Q    Okay.  I showed you some pictures earlier of a wire that was exposed, and I think those are the ones that had the tarp in them, right?

A    Uh-huh.

Q    Yes?

A    Yes.

Q    Okay.  But, aside from that picture, I think you told me that before the bridge was ever painted, one of these electrical companies had taken another picture of an exposed wire, right?

A    Yes.

Q    Okay.  So we're clear on it; there are two separate things?

A    Okay.

Q    Now, the first time that you saw a picture of a defective wire, before the bridge got painted or before there were tarps on there, what part of the bridge was that defective wire from?

A    Oh, I wouldn't know because the photo was so close.  I mean, it was just of that particular location.  I wouldn't know where it was at in contrast to the rest of the bridgeline.

Q    And if I understand some of your other answers, you never asked Beltline or any other electrical

111

contractor to perform any safety inspections on any part of the decorative lighting of the bridge?

A    No.

Q    And the City of Owensboro, as far as you know, never asked any electrical professional to ever inspect or do any sort of safety survey on any of the electrical wiring system for the decorative lighting?

A    No.  Not to my knowledge.

Q    Was there any requests by the City to ever ask an electrical company to check for defects in wires, even after an electrical company had given you a picture of a wire that had burned through or weathered away?

A    Well, I mean, that one area didn't necessarily mean every area up there looked like that.  I mean, it was just a picture of one repair that he made.

Q    Those are all my questions.  Thank you.

RECROSS EXAMINATION BY MR. MAYER:

Q    Sir, us lawyers being lawyers, I have just, I think, two last questions.

Do you have any knowledge as to how many feet or miles of cable or wiring are on that bridge?

A    No.  I don't know.

Q    Okay.  It sounds like the City hired somebody, an electric company, to go up every two years, at least beginning in 2004, from what I understand.  My

112

question is, was that being done in two-year intervals because every two years a number of light bulbs had gone out?

A    Uh-huh.

MR. HARVEY:  Say, "yes" or "no."  You said, "Uh-huh."  "Yes" or "no," please.

A    I'm sorry?

Q    Was that a "yes"?

A    Ask again, please.

Q    Yeah.  That's okay.

Is the reason this work was being done every two years is because, by the time every two years rolls around, there's a number of light bulbs that have gone out?

A    Yes.

Q    What prompts you to contact an electric company is because there are a number of bulbs that need to be replaced?

A    Yes.

Q    Okay.  I think that's all the questions I have.  Thank you.

MR. SCHAD:  I guess we're done.  I'll move any exhibits we marked and referenced.  I've just done one set of exhibits for both deponents.

MR. HARVEY:  That's no problem.

113

MR. SCHAD:  All right.  Thanks.

THE WITNESS:  Thank you.

(VIDEOTAPED DEPOSITION ENDS AT 3:27 P.M.)

AND FURTHER DEPONENT SAYETH NOT: - -

DEPONENT'S SIGNATURE NOT REQUESTED: - -

(WHEREUPON, DOCUMENTS REFERRED TO DURING THE COURSE OF THE VIDEOTAPED DEPOSITION HAVE BEEN MARKED FOR IDENTIFICATION AND HAVE BEEN ATTACHED HERETO AND MADE A PART HEREOF.)

(UNLESS OTHERWISE NOTIFIED BY THE PARTIES INVOLVED, THE TAPED RECORDING MADE IN CONNECTION WITH THE TAKING OF THE VIDEOTAPED DEPOSITION WILL BE DESTROYED THREE MONTHS FROM THE DATE OF THE VIDEOTAPED DEPOSITION.)

COMMONWEALTH OF KENTUCKY)
                                              ) SS:
COUNTY OF DAVIESS                )

I, Jane Belcher, Notary Public, State-at-Large, do hereby certify that the aforegoing deposition was taken at the time and place set forth in the caption thereof; that the witness therein was duly sworn on oath to testify the truth; the proceeding was reported by me stenographically; and the aforegoing is a true and correct transcript to the best of my ability.

I further certify I'm not a relative or employee of attorney or counsel of any of the parties hereto, nor a relative or employee of such attorney or counsel, nor do I have any interest in the outcome or events of this action.

I hereby certify that the appearances were as stated in the caption.

DATED THIS 30th DAY OF December, 2014.

_____
JANE BELCHER, NOTARY PUBLIC
STATE-AT-LARGE
NOTARY ID 479570
OHIO VALLEY REPORTING SERVICE
2200 EAST PARRISH AVENUE, SUITE 106-E
OWENSBORO, KENTUCKY  42303

COMMISSION EXPIRES:
     DECEMBER 7, 2016
COUNTY OF RESIDENCE:
     DAVIESS COUNTY, KENTUCKY