UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:14CV-49-JHM

VERONICA GONZALEZ, individually and
as a Personal Representative of the Estate of
NETZAHUALCOYOLT (NETT) GONZALEZ,
and as Natural Surviving Parent and Guardian of
K. I. G., a minor;
V. J. G., a minor;
N. B. G., a minor; and
K. L. G.-H., a minor                                                    PLAINTIFFS

VS.

CITY OF OWENSBORO;
DOWNTOWN OWENSBORO, INC.;
KEVIN McCLEARN
ROB HECKER; JASON WARD
SHELLEY SINGLETON;
BRYON EDGE; CLINT HOLMES;
JORDAN CAMP; KEVIN COLLIGNON; and
BELTLINE ELECTRIC, INC.                                                 DEFENDANTS

MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion by Defendant, Beltline Electric, Inc., for

summary judgment. [DN 63].  For the reasons that follow, Defendant Beltline's Motion for

Summary Judgment is **GRANTED**.

I.  BACKGROUND

This action arises out of the death of Netzahualcoyolt "Nett" Gonzalez ("Gonzalez") on

May 20, 2013.  At the time of his death, Gonzalez was employed with Spartan Contracting,[1] a

company hired by the Kentucky Transportation Cabinet to paint the Kentucky 2262 Ohio River

---

[1] Although Spartan Contracting was joined to this action by a third-party complaint filed by the City of Owensboro [DN 36], Spartan was dismissed after a determination that Kentucky's Workers' Compensation barred additional recovery from it. [DN 66].

Bridge (hereinafter, "Blue Bridge"). [Compl., DN 7-1, at ¶¶ 18-22]. The Blue Bridge is owned by the Commonwealth of Kentucky and maintained by the Kentucky Transportation Cabinet. Id. While painting the upper bridge frame, Gonzalez was shocked by an electrical wire from a decorative lighting system on the bridge which caused him to fall. [Compl., DN 7-1, at ¶¶ 33-36].

The focus of the present motion is on the Blue Bridge's decorative lighting system, specifically the work performed by Beltline Electric, Inc. in October of 2011. In 1995, Downtown Owensboro, Inc. commissioned Garfield Electric to install the decorative lighting system, and after the system was installed, Downtown Owensboro donated the system to the Defendant City of Owensboro (the "City"). [Ex. 2, DN 63-2]; [Ex. 3, DN 63-3]. The decorative lighting system is jointly maintained by the Kentucky Transportation Cabinet and the City. [Compl., DN 7-1, at ¶ 26]

Starting in 2004, the City contracted with companies to replace burnt out light bulbs on the decorative lighting system.[2] [Ex. A – Depo. of Jeff Tong, DN 72-1, at 81]. In early September of 2011, the City of Owensboro solicited three quotes from companies to work on the decorative lighting system. [Ex. A – Depo. of Jeff Tong, DN 72-1, at 37]. Beltline was one of the companies that submitted a bid for the project. [Ex. C – Ex. 12 to Hess Depo., DN 72-3]. Beltline's proposal stated that it would perform "the inspection of and **minor repairs** of the electrical lighting on the Owensboro bridge" for an estimated cost of $9,905. Id. (emphasis in original). Also, the proposal required that the City furnish Beltline with the lights that were to be installed, caulking to seal the bulbs, and rags for cleaning the excess caulk. Id. Ultimately, Beltline was awarded the contract to work on the decorative light system.

---

[2] Specifically, the lights were checked and replaced in 2004, 2006, and 2008. [Ex. A – Depo. of Jeff Tong, DN 72-1, at 81].

Jeff Tong ("Tong") was the City of Owensboro's contact person for the solicitation of quotes for work on the decorative lighting system was.  [Ex. A – Depo. of Jeff Tong, DN 72-1, at 9-10].   As the City's facilities maintenance manager, one of Tong's responsibilities was "mak[ing] sure the lights are burning" on the Blue Bridge's decorative lighting system. Id. at 26. For the work to be performed on the decorative lighting system in 2011, Tong asked Beltline "to troubleshoot, replace burnt-out lamps, and repair any deficiencies they can find." Id. at 37.

Tim Hess ("Hess"), Operations Manager for Beltline, prepared Beltline's proposal for the work on the decorative lighting system in 2011.  Hess explained the project and the scope of inspection required by Beltline as follows:

> [T]he intent of that word "inspect" in that proposal means to say that we will visually inspect the lights as they were to see if they were working or not working and making that minor repairs. Meaning changing a lamp or a light bulb, changing a ballast and/or putting silicone around the base of the fixture.

[Ex. B – Depo. of Tim Hess, DN 72-2, at 22].  When asked about the full scope of the inspection, Hess reiterated in his testimony that Beltline was there for the limited purpose "[t]o make minor repairs to the fixtures [and] to make sure that the light was going to burn." Id. at 23.  Further, Hess believed that Beltline's inspection of the decorative light system did not extend to testing the wires that provided power to the lamps.  Id.  Finally, Hess was unsure as to whether the City was aware of the limited scope of the inspection that was conducted by Beltline in 2011. Id. at 28-29.

It took Beltline four days, from the 10th to the 13th of October 2011,[3] to replace the bulbs on the Blue Bridge.  [Ex. D – Depo. of Marvin Murphy, DN 72-4, at 50].  The work to replace the light bulbs on the bridge was done mainly by two Beltline employees, Marvin Murphy and

---

[3] Plaintiffs' brief indicates the work lasted for only three days, from the 11th to the 13th of October 2011, but Marvin Murphy's deposition references time sheets for work done on October 10, 2011. [Ex. D – Depo. of Marvin Murphy, DN 72-4, at 50].

John Johnson.  Marvin Murphy ("Murphy") and John Johnson ("Johnson") are both master electricians with more than twenty-five years and fifteen years of experience, respectively. [Ex. D – Depo. of Marvin Murphy, DN 72-4, at 7-8]; [Ex. F – Depo. of John Johnson, DN 72-6, at 6]. When asked about the work performed on the Blue Bridge, Murphy recounted the following:

> I remember we replaced every lamp and every fixture. We had one that did not come on and we took another fixture with a ballast already mounted in it and replaced a bad ballast.

[Ex. D – Depo. of Marvin Murphy, DN 72-4, at 52].  Murphy also noted that to the extent that he conducted an inspection, it was limited to finding any cracked lens and ensuring that the "light itself [was] okay for operation." Id. at 48.  Johnson's recollection of the work mirrored that of Murphy's. See [Ex. F – Depo. of John Johnson, DN 72-6, at 25-26].

On the day following Gonzalez's death, the City of Owensboro de-energized the Blue Bridge's decorative lighting system. [Ex. G – Depo. of Joe Schepers, DN 72-7, at 29].  Although Gonzalez's death appeared to prompt the immediate de-energizing of the system, the City and Spartan had previously discussed de-energizing the system during a pre-construction meeting on April 11, 2013. Id. at 20.  Joe Schepers ("Schepers"), the City's liaison for the project, was present at the pre-construction meeting and was asked to have the City de-energize the bridge for Spartan's painting of the Blue Bridge. Id. 21-22.  On May 13, 2013, Schepers received a call from Nick Hazimihalis,[4] Spartan's project manager, asking him to de-energize the system. Id. Due to some confusion about how the decorative lighting system worked, Schepers informed the Kentucky Transportation Cabinet ("KTC") that they would need to bring in an electrical

---

[4] The deposition transcript for Joe Schepers uses the spelling "Hasmohollus" instead of Hazimihalis, but the Court is relying on the Opinion Award and Order issued by Kentucky's Department of Workers' Claim [DN 54-3, at 17] for the proper spelling.

engineer to have the system de-energized. [5] Id. at 25-26.  By Monday, May 20, 2013, Schepers had learned that the City did have the ability to de-energize the decorative lighting system without the involvement of KTC, despite being told otherwise previously.  Id. at 28.  Based on this new information, Schepers planned to get into contact with the proper person to shut down the system on the following day.  However, due to Gonzalez's death, the system was quickly shutdown on the morning of May 21, 2013. Id. at 29.  When asked about this delay in shutting down the system, Schepers admitted that it should not have taken a week to de-energize the decorative lights but claimed that part of the problem was with Spartan starting the work while the system was still operational. Id.

On December 3, 2013, officials from the Kentucky Transportation Cabinet met with several employees with the City of Owensboro concerning the status of the decorative lighting system on the Blue Bridge. [Ex. G – Depo. of Joe Schepers, DN 72-7, at 35].  During the meeting, the City was instructed to keep the system de-energized until further notice. [Ex H – KTC letter of Jan. 22, 2014, DN 72-8].  In addition, KTC told the City that the system needed to be in compliance with the appropriate electrical code before the decorative lights could be used again. Id.  These issues were covered in a letter sent from KTC to the City in early January of 2014. Id.

In order to bring the Blue Bridge into compliance with the electrical code, the City of Owensboro contracted with URS Aesthetic Lighting ("URS") to conduct an inspection of the decorative lighting system.  [Ex. I – URS Aesthetic Lighting Inspection Final Report, Jan. 16,

---

[5] On May 15, 2013, Schepers discussed de-energizing the system with Austin McLimore, an engineer with Owensboro Municipal Utilities ("OMU"). [Ex. G – Depo. of Joe Schepers, DN 72-7, at 24].  During the discussion, McLimore told Schepers that the panel for the decorative lighting system also connected all the other lights on the Blue Bridge, including the navigational lights.  Id.  Although Schepers believed that the navigational lights were on a different panel—which was ultimately correct, he finally accepted what he was told by McLimore and agreed that the Kentucky Transportation Cabinet needed to be involved in order for the system to be de-energized. Id. at 25.

2015, DN 72-9, at 3].   URS inspected the Blue Bridge on the August 5th and 6th, 2014 and presented its findings to the City on January 16, 2015.  Id.  The inspection team comprised of a master electrician with Arrow Electric, URS's project manager, and a National Electric Code expert with Independent Electrical Contractors, Inc. Id.  The inspectors documented multiple code violations, including that "[a]t several fixtures the insulation ha[d] deteriorated and [was] missing, leaving exposed copper."  Id. at 5.  Along with their written report, the inspectors photographed exposed wiring that resulted from worn insulation. See, e.g., [Ex. K – 1 – Selected Photographs from URS report, DN 72-11].   Based on the code violations, URS recommended that the City keep the bridge de-energized until it made the necessary repairs. [Ex. I – URS Aesthetic Lighting Inspection Final Report, Jan. 16, 2015, DN 72-9, at 6].

## II.  STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Instead, the Federal Rules of Civil Procedure require the non-

moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.  It is against this standard the Court reviews the following facts.

### III. ANALYSIS

Plaintiffs advance two different theories of recovery against Defendant, both of which are a form of negligence under Kentucky law. Plaintiffs' first theory of common law negligence "requires proof of (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury." Wright v. House of Imports, Inc., 381 S.W.3d 209, 213 (Ky. 2012) (citation omitted). Plaintiffs contend that when Beltline undertook to replace the bulbs on the decorative lighting system in October of 2011, it "either failed to inspect the wiring at all – or saw the defects and did nothing." [Pls.' Mem. in Opp'n to Def. Beltline's Mot. for Summ. J., DN 72, at 7].

Plaintiffs' second theory of negligence per se is a slight variation of common law negligence in which "'a statutory [or regulatory] standard of care [is] substituted for the common law standard of care.'" Wright, 381 S.W.3d at 213 (quoting Real Estate Mktg., Inc. v. Franz, 885 S.W.2d 921, 927 (Ky.1994)).  In this instance, Plaintiffs allege that Beltline's standard of care derives from Kentucky's statutes and regulations governing the duties of electricians. Specifically, Plaintiffs claim that Beltline's electricians working on the Blue Bridge in 2011 should have observed the faulty wiring and were obligated to report the condition to the City.

### A.  Common Law Negligence

Plaintiffs seem to recognize that their common law negligence claim requires not only the existence of a duty owed by Beltline to the City, but rather, it requires the existence of a duty owed by Beltline to the Plaintiff's decedent.  Thus, Plaintiffs' claim is based on the Restatement (Second) of Torts § 324A (1965), which Kentucky has adopted.   Ostendorf v. Clark Equipment Co., 122 S.W.3d 530, 538-39 (Ky. 2003).    Under certain circumstances, § 324A imposes liability on a party who assumes and undertakes a duty through affirmative conduct if he fails to exercise reasonable care in performing that undertaking. Specifically, § 324A provides as follows:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).

The threshold issue in a claim under § 324A is whether the defendant undertook to render services to another for the protection of a third party.  See Good v. Ohio Edison Co., 149 F.3d 413, 420 (6th Cir. 1998). "[Section 324A] has been labeled ominously as the 'undertaker's doctrine.' As the name implies, there must be an 'undertaking.'" Jenkins v. Best, 250 S.W.3d 680, 693 (Ky. App. 2007) (internal citation omitted).  To determine the scope of a defendant's undertaking, courts look to both contractual obligations and affirmative acts that demonstrate the assumption of responsibility for providing safety to third persons. See Roberson, 212 S.W.3d at 111.  However, a plaintiff may not rely on a vague obligation of safety but must identify specific

8

language to demonstrate that the defendant undertook to inspect or make safe a particular piece of equipment or area that plaintiff alleges resulted in his injury. McAtee v. Fluor Constructors Intern., Inc., 188 F.3d 508 (6th Cir. 1999) ("'An actor's specific undertaking of the services allegedly performed without reasonable care is a threshold requirement to section 324A liability. The scope of this undertaking defines and limits an actor's duty under section 324A.'" (quoting In re TMJ Implants Prod. Liab. Litig., 113 F.3d 1484, 1493 (8th Cir. 1997) (citations omitted)).

With regard to whether there was a specific undertaking, the parties spend a lot of time disputing whether or not the contract between Beltline and City required Beltline to do a full inspection of the wiring system or whether it was of more limited in scope. Plaintiffs claim that Beltline was contractually obligated to inspect the Blue Bridge, particularly the exposed wiring that shocked Gonzalez. Beltline does not refute the fact that it was required to conduct an inspection of certain areas of the bridge. Instead, it argues that the scope of its inspection was limited to checking to make sure the lights illuminated and making minor repairs on the light fixtures.

The proposal stated that Beltline would perform "the inspection of and **minor repairs** of the electrical lighting on the Owensboro bridge." [Ex. C – Ex. 12 to Hess Depo., DN 72-3]. However, it is not exactly clear from the testimony of those involved as to what that meant. For example, in Tong's deposition, he seemed to state at one point that Beltline was not hired to inspect the type of electrical wiring that shocked Gonzalez:

> Q And if I understand some of your other answers, you never asked Beltline or any other electrical contractor to perform any safety inspections on any part of the decorative lighting of the bridge?
>
> A No.

> Q And the City of Owensboro, as far as you know, never asked any electrical professional to ever inspect or do any sort of safety survey on any of the electrical wiring system for the decorative lighting?
>
> A No. Not to my knowledge.

[Ex. A – Depo. of Jeff Tong, DN 72-1, at 110-11].  Conversely, earlier in the deposition, Tong's

expectations concerning the scope of Beltline's work was less clear:

> Q And did you ask them to do those inspections because you wanted to make sure that the electrical system would work safely?
>
> A To make sure it was working, yes.
>
> Q Okay. Is one of the reasons that you asked them to inspect to make sure that the electrical system was working safely?
>
> A I'm assuming safely while they're working on it, yes. That would be their responsibility.
>
> Q Okay. And when you asked Beltline on those four previous occasions to inspect it, do you give them any sort of guidance?
>
> A No.

Id. at 54.

The testimony of Hess appears to do little to assist in defining the scope of Beltline's

work.  At first, Hess seems clear that Beltline was not involved in the inspection of the electrical

wiring:

> Q You did not intend for this inspection language to apply to any of the wires which would have provided power to the lamps themselves?
>
> A No.
>
> …
>
> Q I'm not asking whether it was mainly focused.  I'm asking whether the scope of the work you did would include any inspection or examination of the power line to the lights?
>
> A No.

[Ex. B – Depo. of Tim Hess, DN 72-2, at 24, 28].  But, when shown pictures of the wiring that allegedly caused the shock to Gonzalez, the answer was different:

> Q Is that a condition which, if observed by a Beltline electrician, would have been within the scope of the work you were doing on the bridge in 2011?
>
> A If they would have seen it, yes.
>
> Q Explain why.
>
> A Explain why?
>
> Q Yes. Why you feel that way.
>
> A A broken insulation on a conductor should be repaired.

Id. at 33-34.

Despite the lack of clarity from Tong and Hess, Murphy, the foreman at the worksite, was sure of the scope of the work that Beltline was hired to do that day.

> Q  . . . This says it's a proposal for the inspection and minor repairs of the electrical lighting on the Owensboro bridge.
>      Do you know what's meant by an inspection of the electrical lighting on the bridge?
>
> A On the lighting on the bridge, it would be make sure you don't have a crack lens, making sure that the light itself is okay for operation.
>
> Q In your mind, would inspection mean anything else?
>
> A No.
>
> . . .
>
> Q What was the work that was being performed?
>
> A Repairing the bridge lights.
>
> . . .
>
> Q Is that not what you were looking for up there in the work you were doing in
>
> 2011?

A  We were replacing lamps is what we were doing.

[Ex. D – Depo. of Marvin Murphy, DN 72-4, at 48, 51, 69].  In addition to discussing Beltline's work in October of 2011, Murphy was shown photographs taken in 2014 of worn insulation and exposed wiring and he could not recall seeing any exposed wiring like that as depicted in the photographs. Id. at 68.  However, if he had, he said that he would have reported it to the City. Id. at 48-49.

It appears to the Court that resolution of the initial question could go either way. Therefore, for purposes of deciding this motion, the Court will assume, as Plaintiffs allege, that Beltline specifically undertook the performance of a safety inspection and they failed to exercise reasonable care in doing so. What remains to be discussed is whether any of the three subsections to § 342A apply under the facts of this case.

Subsection (a) imposes liability on one who assumes an undertaking, and fails to exercise reasonable care, if his failure to exercise reasonable care increases the risk of such harm. As to subsection (a), "'[t]he test is not whether the risk was increased over what it would have been if the defendant had not been negligent,' but rather whether 'the risk [wa]s increased over what it would have been had the defendant not engaged in the undertaking at all.'" Good v. Ohio Edison Co., 149 F.3d 413, 421 (6th Cir. 1998) (quoting Myers v. United States, 17 F.3d 890, 892 (6th Cir. 1994).  Plaintiffs have solely relied on the allegation that Beltline negligently failed to inspect the wiring, and thus, failed to correct the deficiencies they would have seen if they had fully inspected the wiring.  However, these allegations are insufficient under subsection (a) because even though Beltline did nothing to diminish the risk posed by the bare wire, it did nothing to increase the risk that already existed.  Failing to inspect the entire system had the

same effect as if Beltline had never engaged in the undertaking in the first place.   Therefore, subsection (a) has no applicability.

Subsection (b) imposes liability on one who assumes an undertaking, and fails to exercise reasonable care, if the undertaking was to perform a duty owed by the other to the third person. In other words, the question is whether Beltline undertook to perform a duty owed by the City to Spartan Contracting, and specifically, Mr. Gonzalez.   The Court has assumed, as an initial matter, that Beltline undertook to perform a full safety inspection of the wiring system, but the question here is focused on whether Beltline performed that work for the City to discharge the duty the City owed to Spartan Contracting and its employees.

Here, it is helpful to see how § 342A has been applied in other cases.   The Kentucky Supreme Court applied § 324A to a case involving a ten-year old boy who was struck by a car while crossing a five-lane highway. <u>Louisville Gas and Elec. Co. v. Roberson</u>, 212 S.W.3d 107, 108 (Ky. 2006).  The plaintiffs filed suit against Louisville Gas & Electric Company ("LG & E") on the basis it had negligently maintained a street lamp that was not working claiming that the lack of light caused the driver not to see the boy crossing the street.  <u>Id</u>.  The court first addressed the fact that Jefferson County generally owed a duty to motorists and pedestrians to exercise ordinary care in maintaining and improving streets and to keep those roadways in "a reasonably safe condition."  <u>Id</u>. at 111.  Additionally, "if a discretionary determination is made as to a means (i.e., lighting) of improving public highway safety, there is a duty to exercise ordinary care to maintain the safety improvement."  <u>Id</u>.  Under the facts of <u>Roberson</u>, Jefferson County added the street lamp to the highway for the purposes of improving the safety of those who used the road and contracted with LG & E to maintain the lights for that reason.  LG & E had no independent duty with respect to the street lamp, and any duty it had arose solely from its   contract with

13

Jefferson County.  Thus, relying on § 324A, the court found that LG & E, by virtue of its contract with Jefferson County, undertook the same duty as the County—to exercise ordinary care in the maintaining of the lights. Id.

While Roberson is instructive on the general application of § 324A, it does not address a situation in which the putative tortfeasor may have contracted for a limited role in the inspection or maintenance of a particular work area.[6]  The Court believes that the facts of an unpublished Sixth Circuit case more closely parallel the issues of the present case. In McAtee v. Fluor Constructors Intern., Inc., 188 F.3d 508 (6th Cir. 1999), the plaintiff was employed with SOS, a subcontractor of FDEC, and was shocked while installing a metal cover over electrical insulation while working at a TVA plant.  McAtee v. Fluor Constructors Intern., Inc., 188 F.3d 508, *1 (6th Cir. 1999).  FDEC also subcontracted with FCI to provide "construction management and engineering safety services."  Id.  The injured employee filed suit against FCI on the theory that it owed a duty under § 324A and that FCI breached that duty by failing to de-energize the wiring that caused the shock.  Id. at *6.  The Sixth Circuit rejected the idea that FCI could be held liable for not de-energizing the wiring simply because it was generally responsible for "plant safety." Id.  Rather, the court held that success on a claim based on § 324A required the plaintiff to provide evidence that

> [FCI] undertook to render safety services with respect to Plaintiff's work near the wire, such as (i) pre-work inspection for hazards in and around SOS employee work areas, (ii) monitoring of SOS employees and their supervisors as they performed particular tasks, or (iii) actual abatement of work area hazards before SOS employees like Plaintiff began working near them.

Id. In applying this outline to the facts of McAtee, the Sixth Circuit summarized the inapplicability of § 324A as follows:

---

[6] In contrast, the Kentucky Supreme Court interpreted LG & E's duty to maintain the street lamps as completely supplanting that of Jefferson County's. Roberson, 212 S.W.3d at 113.

However, despite leading these general safety meetings, [Steven Meadows, FCI's safety engineer,] and FCI did not assume responsibility for the specific safety of all employees at the work site. FCI personnel were not informed of what specific jobs other subcontractors (such as SOS) were performing on a particular day, and did not undertake to monitor every job being done. Although FCI (through Meadows) did encourage safety and conduct general safety meetings, the evidence on record demonstrates that identifying hazards and specifically supervising SOS workers was the responsibility of Plaintiff's supervisor, Richard Ford, a fellow SOS employee. As Meadows testified: "The safety of the employees and watching over the employees' safety on the jobs, that was their foreman's direct responsibility." Indeed, even Ford, who gave Plaintiff the work assignment at the time of injury, testified that abating work hazards for SOS employees was part of his responsibility as a foreman.

McAtee, 188 F.3d 508, *7 (internal citations omitted).

There is no evidence, even if Beltline was to have conducted a full safety inspection of the wiring on the bridge, that either the City or Beltline intended that undertaking in 2011 to be in place of or discharge the duty the City had to ensure the safety of Spartan employees in 2013 when the bridge was to be painted. The Court considers what transpired between the City and Spartan prior to the repainting of the bridge as telling. Beltline was not involved in any of the pre-construction meetings that directly addressed the safety of workers on the bridge. Rather, the City and Spartan seemed to resolve concerns about the decorative lighting system by having the City de-energize the system. Much like FCI in McAtee, Beltline was not hired by the City for the specific purpose of ensuring the safety of Spartan employees during the painting project. In fact, when asked about prior safety inspections, Tong admitted that he never asked Beltline to perform a safety inspection of the decorative lighting system nor was he aware of the City ever conducting a safety inspection prior to the one by URS. Furthermore, Beltline was not even present at the worksite when Spartan was working as Beltline had completed its work nineteen moths prior to the repainting of the bridge. Beltline had no continuing obligation to maintain the decorative wiring system like LG & E's duty in Roberson. Therefore, the Court finds subsection (b), inapplicable under these facts.

15

Lastly, as to subsection (c), it imposes liability on one who assumes an undertaking and fails to exercise reasonable care in performing it if the harm is suffered because of reliance of the other or the third person upon the undertaking.   Plaintiffs have not shown that either the City or Spartan or Mr. Gonzalez was induced to forgo other safety measures due to Beltline's work.   See Restatement (Second) of Torts § 324A cmt. e (1965) ("Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk."). Again, the Court finds the pre-construction meeting relevant due to the fact that the evidence indicates that Spartan relied on the City to de-energize the system during the safety discussions, not on Beltline's work in 2011.  When Spartan needed the system de-energized, a phone call was made to Schepers with the City.  In turn, he contacted the OMU, not Beltline, for the purposes of de-energizing the system.  There is no indication that Spartan's employees relied on Beltline for their safety while painting the bridge.

For those reasons, the Court finds that the Plaintiffs have failed to state a viable claim under § 324A.

### B.  Negligence Per Se

Although Plaintiffs do not directly identify their second theory as one based on negligence per se, they assert that "Beltline had a statutory duty as established by the legislature to Gonzalez to perform its services for the City with professional judgment and with reasonable care." [Pls.' Mem. in Opp'n to Def. Beltline's Mot. for Summ. J., DN 72, at 15].  As previously explained, negligence per se utilizes a statutory duty of care instead of the common law duty. Kentucky codified the common-law doctrine of negligence per se in KRS 446.070, which states that "[a] person injured by the violation of any statute may recover from the offender such

damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."  KRS 446.070.

In the present matter, Plaintiffs refer to various statutes and regulations in Kentucky that require electricians to be licensed, that impose ethical obligations and subject electricians to disciplinary action.  See, e.g., KRS 227A.110(1)(b) (calling for the discipline of electricians that have "[b]een incompetent or negligent in the practice of performing electrical work").  Plaintiff's complaint does not refer to a particular statute which was violated.  In their briefing, they do no cite to any cases which have applied the negligence per se standard to KRS Chapter 227A.  Further, reliance on a statute that calls for the discipline of an electrician who negligently performs his work cannot act as a substitution for the common law standard of care because the standards are identical.  In other words, the application of this statute would simply result in a duplicative analysis, that is, the Court has already applied negligence as the standard of care in this case.  Additionally, the Court notes that Plaintiff makes vague references to the National Electrical Code (NEC) which requires Beltline and its electricians to comply with certain safety standards.  [Pls.' Mem. in Opp'n to Def. Beltline's Mot. for Summ. J., DN 72, at 13-14].  However, negligence per se does not apply beyond Kentucky's statutes.  Young v. Carran, 289 S.W.3d 586, 589 (Ky. Ct. App. 2008) ("Kentucky courts have held that the 'any statute' language in KRS 446.070 is limited to Kentucky statutes and does not extend to federal statutes and regulations or local ordinances." (citing T & M Jewelry, Inc. v. Hicks ex rel. Hicks, 189 S.W.3d 526, 530 (Ky. 2006)).  Therefore, the Court finds Plaintiffs' claim for negligence per se not a viable form of relief.

## IV.  CONCLUSION

For the foregoing reasons, Defendant Beltline's Motion for Summary Judgment [DN 63]

is **GRANTED**.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

July 29, 2015

cc: counsel of record